[No. S151402. Oct. 30, 2008.]

SAVE TARA, Plaintiff and Appellant, v.
CITY OF WEST HOLLYWOOD, Defendant and Respondent;
WASET, INC., et al., Real Parties in Interest and Respondents.

120

**COUNSEL**

Chatten-Brown & Carstens, Jan Chatten-Brown, Douglas P. Carstens, Katherine A. Trisolini and Amy C. Minteer for Plaintiff and Appellant.

Law Offices of Michael W. Stamp and Michael W. Stamp for Save Our Carmel River and The Open Monterey Project as Amici Curiae on behalf of Plaintiff and Appellant.

Frank G. Wells Environmental Law Clinic, Sean B. Hecht; Neighborhood Legal Services of Los Angeles County, David Pallack and Joshua Stehlik for Lincoln Place Tenants Association, People for Parks, Sierra Club and Trudy Saposhnek as Amici Curiae on behalf of Plaintiff and Appellant.

Shute, Mihaly & Weinberger, Rachel B. Hooper, Amy J. Bricker, Michelle W. Anderson; Law Offices of Donald B. Mooney and Donald B. Mooney for Environmental Defense Center, California Preservation Foundation, Planning and Conservation League and Natural Resources Defense Council as Amici Curiae on behalf of Plaintiff and Appellant.

Jenkins & Hogin, Michael Jenkins, John C. Cotti and Christi Hogin for Defendant and Respondent.

Aleshire & Wynder, David Aleshire and Joseph W. Pannone for League of California Cities as Amicus Curiae on behalf of Defendant and Respondent.

Truman & Elliott, Kathleen O'Prey Truman and Todd Elliott for Housing California and Southern California Association of Nonprofit Housing as Amici Curiae on behalf of Defendant and Respondent.

Latham & Watkins, James L. Arnone, Stephanie E. Ord, Ernest J. Hahn and Benjamin J. Hanelin for Real Parties in Interest and Respondents.

## OPINION

**WERDEGAR, J.**—Under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[1] a public agency must prepare an environmental impact report (EIR) on any project the agency proposes to "carry out or approve" if that project may have significant environmental effects (§§ 21100, subd. (a), 21151, subd. (a)). We address in this case the question whether and under what circumstances an agency's agreement allowing private development, conditioned on future compliance with CEQA, constitutes approval of the project within the meaning of sections 21100 and 21151. We conclude that under some circumstances such an agreement does amount to approval and must be preceded by preparation of an EIR. Under the circumstances of this case, we further conclude the City of West

---

[1] All further unspecified statutory references are to the Public Resources Code.

Hollywood's conditional agreement to sell land for private development, coupled with financial support, public statements, and other actions by its officials committing the city to the development, was, for CEQA purposes, an approval of the project that was required under sections 21100 and 21151 to have been preceded by preparation of an EIR.

FACTUAL AND PROCEDURAL BACKGROUND

The property at 1343 North Laurel Avenue (1343 Laurel) in the City of West Hollywood (City) is occupied by a large colonial-revival-style house constructed in 1923, later converted to four apartments, and a chauffeur's house and garage. The buildings are set well back from the street, and the property is heavily wooded and landscaped, in contrast to most other properties on the block. City designated the main house a local cultural resource in 1994. In 1997, Mrs. Elsie Weisman, the longtime owner of 1343 Laurel, donated it to City on condition she be permitted to live there until her death and the other tenants be permitted to occupy the premises for six months after her death. Mrs. Weisman died in 2000 at the age of 101.[2]

Two nonprofit community housing developers, West Hollywood Community Housing Corporation and WASET, Inc., and a corporation they created for the purpose, Laurel Place West Hollywood, Inc. (collectively, Laurel Place), propose to develop approximately 35 housing units for low-income seniors on the 1343 Laurel site. As outlined in a 2003 grant application to the United States Department of Housing and Urban Development (HUD), the project would preserve the main house but not the chauffeur's house or garage. The existing two-story house would be converted to hold the manager's apartment, one resident's apartment, and communal space, including a multipurpose room, arts and crafts room, television lounge and kitchen. A new three-story building, wrapping around the existing house's back and sides, would contain 33 one-bedroom apartments and underground parking spaces for residents. Between the back of the existing house and the new building would be a landscaped courtyard. A 2,800-square-foot portion of the existing front yard would remain in City's hands and be used as a pocket park. The HUD application included preliminary architectural drawings showing the proposed renovation, new building, site plan and landscaping.

On June 9, 2003, to facilitate Laurel Place's HUD grant application, City's city council granted Laurel Place an option to purchase the 1343 Laurel property, allowing the developer to show HUD it had control of the project site. In a June 10 letter to a HUD official, City's city manager outlined City's

---

[2] Whether because of its estate-like appearance or because Gone With the Wind (Metro-Goldwyn-Mayer 1939) was Mrs. Weisman's favorite film, 1343 Laurel has acquired the popular nickname "Tara."

intended contribution to the proposed project: "To make the project competitive, [City] has approved the sale of the property at negligible cost." More specifically, City planned to contribute $1.5 million in land value. "In addition, [City] will commit additional funding, in an amount not to exceed $1 million," toward development costs. "In summary, [City] will be contributing land and funds totaling $2,500,000 toward the development of the Laurel Place project."

HUD approved a $4.2 million grant to Laurel Place in late 2003. City's mayor announced the grant in a December 2003 e-mail to residents, explaining it "will be used to build 35 affordable senior residential units, rehabilitate an historic house, and provide a public pocket park on Laurel Avenue." He described the project as "a win-win-win for the City, balancing desperately needed affordable senior housing with historic preservation and open space." Similarly, a City newsletter announced that with the recent HUD grant, City and Laurel Place "will redevelop the property" to rehabilitate the main house, build 35 units of low-income senior housing, and create a pocket park. The mayor's announcement referred residents with questions about the proposed development to Jeffrey Skornick, City's housing manager.

Shortly after the HUD grant was approved, in November 2003, Skornick wrote to a 1343 Laurel tenant, Allegra Allison, reassuring her that "nothing is going to happen for about a year" and that "[a]s the project proceeds and prior to construction" the tenants would receive professional relocation assistance. While he knew she would prefer to stay at 1343 Laurel, the housing manager wrote, he pledged, on City's behalf, to "do everything in our power to minimize the impact of this project on you." In December 2003, Allison responded that "your relocation people" had already contacted tenants and, according to one tenant, had said they would soon be served with "one year eviction notices."

In January 2004, Skornick, responding to a resident critical of the proposed development, explained that the project would retain the historic house and most of the property's front yard, as the new building would be to the rear of the site. He continued: "We are happy to consider variations on the approach. However, inasmuch as the City and its development partners have been awarded a $4.2 million federal grant to help develop this project for senior housing, we must continue on a path that fulfills this obligation." In another January 2004 e-mail to a resident, a city council member's deputy used the same language, referring to the development of senior housing on the site as an "obligation" City "must" pursue.

On April 23, 2004, City announced the city council would consider, at its May 3 meeting, an agreement to facilitate development of the 1343 Laurel

project, "subject to environmental review" and other regulatory approvals. Save Tara, an organization of City residents and neighbors opposed to the project, wrote City to urge that it conduct CEQA review, including an EIR, *before* approving any new agreement, making a loan, or renewing the purchase option. Despite that and numerous other objections voiced at the meeting (many also expressed support), the city council on May 3, 2004, voted to (1) approve a "Conditional Agreement for Conveyance and Development of Property" between City and Laurel Place, including a $1 million City loan to the developer, in order to "facilitate development of the project and begin[] the process of working with tenants to explore relocation options"; (2) authorize the city manager to execute the agreement "substantially in the form attached"; and (3) have appropriate City commissions review "alternative configurations" for the planned new building and obtain more public input "on the design of project elements."

The "Conditional Agreement for Conveyance and Development of Property" the city council thus approved and authorized the city manager to execute (the May 3 draft agreement) had the stated purpose of "caus[ing] the reuse and redevelopment of [1343 Laurel] with affordable housing for seniors and a neighborhood pocket park, while retaining the historic integrity of the Site." The agreement provided that "upon satisfaction of the conditions of this Agreement," City would convey the property to Laurel Place and provide the developer a loan, and Laurel Place would construct 35 units of housing, one for the resident manager and 34 restricted to occupancy by low-income seniors. In the first phase of actions under the agreement, Laurel Place would obtain final HUD approval, "complete the relocation of tenants"[3] and take actions necessary "to comply with CEQA . . . ." Once the property was conveyed, the second, construction phase would begin.

Under the May 3 draft agreement, City's obligation to convey the property and make the improvement portion of the loan (i.e., all of the $1 million loan other than the predevelopment portion and an earlier grant for $20,000) was subject to several conditions precedent, among them that "[a]ll applicable requirements of CEQA . . . have been satisfied, as reasonably determined by the City Manager" and that "[d]eveloper shall have obtained all Entitlements."[4] The city manager, however, could waive these conditions. The predevelopment portion of the loan, which City estimated at $475,000, was to

---

[3] A staff report on the proposed agreement, presented to the city council, explained that relocation notices would be sent "shortly after" the agreement was executed, starting a one-year period for relocating the tenants.

[4] The May 3 draft agreement defined "Entitlements" to include zoning changes, general plan amendments, and CEQA compliance, as well as any other permit or license required by City.

be used for, inter alia, "environmental reports" and "governmental permits and fees" and was not subject to the CEQA compliance or entitlement conditions.

A "Scope of Development" discussion attached to the May 3 draft agreement explained that "[a] three- or four-story building over semi-subterranean parking will be erected at the west-rear portion of the lot, replacing what are currently the garage and outdoor parking area, and possibly the chauffeur's quarters." The new building's exterior and interior design were described in some detail.

At the city council's May 3, 2004, meeting, the project architect explained that the exact building design had not yet been determined and that historic preservation values would be fully considered in the final design. For example, the chauffeur's house could be preserved, while still adding 35 housing units, by making the new building four stories rather than three, though the architect for aesthetic reasons preferred a three-story building.

Skornick, City's housing manager, similarly told the council that the further planning processes the project would undergo were "not a rubber stamp," as there were "real options to consider" regarding the design of the new building and park. At the same time, Skornick noted that staff had already rejected the alternative uses of 1343 Laurel suggested in public comments, such as dedication of the entire property for a park or use of the historic home as a library or cultural center. These alternatives, Skornick explained, failed to contribute to City's affordable housing goals and, in any event, "there were no funds available for those options." Finally, Skornick stressed that "while the agreement is conditional, the council needs to know that the recommended actions will commit the city as long as the developer delivers."

On July 12, 2004, Save Tara filed the operative complaint and petition for writ of mandate alleging, inter alia, that City had violated CEQA by failing to prepare an EIR before the city council's May 3 approval of the loan and draft agreement. On August 9, 2004, City and Laurel Place executed a revised agreement (the August 9 executed agreement).[5] This agreement followed the

---

[5] Save Tara argues the administrative record should not have been augmented with the August 9 executed agreement, as its execution took place *after* the decision Save Tara has challenged, i.e., the city council's approval of the May 3 draft agreement. We agree with the Court of Appeal, however, that "[w]hile the May 2004 agreement is relevant for certain purposes, review of City's decision would be ineffective, if it were limited to the May 2004 Agreement, which is no longer operative." Like the lower court, we treat Save Tara's petition for writ of mandate as amended to address the August 9 executed agreement as well as the May 3 draft agreement.

May 3 draft agreement in many respects, but contained some potentially significant changes. The requirement that all applicable CEQA requirements be satisfied could no longer be waived by the city manager, and the parties expressly recognized *City* retained "complete discretion over . . . any actions necessary to comply with CEQA" and that the agreement "imposes no duty on City to approve . . . any documents prepared pursuant to CEQA." Finally, details on tenant relocation were stated, including that the developer was to begin the process by hiring a relocation consultant within 30 days.

The superior court denied Save Tara's mandate petition, finding that while the parties agreed the 1343 Laurel project did call for an EIR at some time, none was required before approving the May 3 draft agreement because "the Agreement is expressly conditioned on compliance with CEQA . . . [and] does not limit the project alternatives or possible mitigation measures." Thus, City "has not given its final approval to convey the property at issue to [Laurel Place], nor has it given its final approval of the housing project itself."

The Court of Appeal reversed. Section 21100, the appellate court reasoned, requires an EIR be prepared whenever lead agencies "propose to approve or carry out" a project with potential significant effects; it is not, contrary to the trial court's holding, "to be delayed until a 'final' decision has been made." Moreover, conditioning a development agreement on CEQA compliance is insufficient because the EIR review process "is intended to be part of the decisionmaking process itself, and not an examination, *after the decision has been made*, of the possible environmental consequences of the decision." Any question as to whether a particular point in the development process is too early for preparation of an EIR "is resolved by the pragmatic inquiry whether there is enough information about the project to permit a meaningful environmental assessment. If the answer is yes, the EIR review process must be initiated." Before May 3, 2004, the Court of Appeal held, the project was well enough defined to permit meaningful environmental analysis, which City should have performed between the award of the HUD grant in November 2003 and the approval of the May 3 draft agreement.

As remedy for the CEQA violation, the Court of Appeal remanded with directions that City be ordered (1) to void its approval of the May 3 and August 9 agreements, and (2) to "engage in the EIR review process (a) based on the project as described in the HUD application and (b) without reference to the May and August 2004 Agreements." One justice dissented, arguing the matter was moot because, according to the parties, City had certified a final EIR for the project in October 2006.

We granted City's and Laurel Place's petitions for review, which presented the mootness issue as well as the substantive question of whether an EIR was required before City's approval of the conditional development agreement.

DISCUSSION

I. *Mootness*

According to the Court of Appeal decision, City approved a final EIR for the 1343 Laurel project in October 2006, during pendency of the appeal. All parties agree on this chronology and further agree that Save Tara has not challenged the adequacy of this EIR in court.

The parties dispute whether these events rendered the present appeal moot. City and Laurel Place take the position that Save Tara has already received the relief it seeks in this action—preparation and certification of an EIR—and no further effective relief can be granted it. They cite CEQA cases in which, during pendency of the litigation, the project site had undergone irreversible physical or legal changes. (See, e.g., *Environmental Coalition of Orange County, Inc. v. Local Agency Formation Com.* (1980) 110 Cal.App.3d 164, 171–173 [167 Cal.Rptr. 735] [challenge to EIR for annexation moot where annexation had already occurred and could not be ordered annulled because annexing city was not a party to the action]; *Hixon v. County of Los Angeles* (1974) 38 Cal.App.3d 370, 378 [113 Cal.Rptr. 433] [street improvement project involving tree replacement had already progressed to removal of original trees, which could not be restored].) Save Tara, in turn, argues that effective relief, in the form of an order setting aside City's approval of the May 3 draft agreement and August 9 executed agreement, can still be awarded, as it was by the Court of Appeal. It cites CEQA cases that were held not to be moot despite some intervening progress on the project. (See, e.g., *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1202–1204 [22 Cal.Rptr.3d 203] [partial construction of a project did not moot the appeal, as the project could still be modified, reduced, or mitigated]; *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888 [92 Cal.Rptr.2d 268] [already constructed project could be modified or removed].)

We agree with Save Tara that the preparation and certification of an EIR does not render the appeal moot. No irreversible physical or legal change has occurred during pendency of the action, and Save Tara can still be awarded the relief it seeks, an order that City set aside its approvals. As will appear, we ultimately conclude the matter must be remanded with directions that the superior court order City to void its approval of the May 3 and August 9 agreements and reconsider those decisions, informed this time by an EIR of

the full environmental consequences. Neither City nor Laurel Place contends such reconsideration is impossible as a practical matter or that the superior court lacks the power to order it. Such an order remedies the CEQA violation Save Tara alleges occurred, approval of the agreements without prior preparation and consideration of an EIR, and thus constitutes effective relief.

## II. *Timing of EIR Preparation*

We turn to the substantive CEQA issue presented: Was City required to prepare and consider an EIR before approving the conveyance and development agreement on May 3 and executing the revised agreement on August 9, 2004? To answer this question, we first outline, in this part of the opinion, the existing law on timing of EIR preparation and the legislative policies that shape this law. We next address, in part III., the general question of whether an agency may delay EIR preparation by making its final approval of a project contingent on subsequent CEQA compliance, while otherwise agreeing to go forward with the project. In part IV., we apply our conclusions to the facts of this case to determine that City's May 3 and August 9 actions constituted project approval requiring prior preparation of an EIR.

We begin with CEQA's text. Section 21100, subdivision (a) provides in pertinent part: "All lead agencies shall prepare, or cause to be prepared by contract, and certify the completion of, an environmental impact report on any project which they *propose to carry out or approve* that may have a significant effect on the environment." (Italics added.) To the same effect, section 21151 provides that "local agencies shall prepare, or cause to be prepared by contract, and certify the completion of, an environmental impact report on any project that they *intend to carry out or approve* which may have a significant effect on the environment." (Italics added.)[6]

While the statutes do not specify criteria for determining when an agency "approve[s]" a project, the law's implementing regulations, the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.),[7] do address the question. Section 15352 of the CEQA Guidelines provides as follows:

---

[6] Both sections appear applicable to City. Section 21151 applies to local governments by its terms. Section 21100, although placed in a chapter of CEQA mainly addressing the duties of state agencies, itself applies to all "lead agencies," a term that includes local public entities undertaking projects subject to CEQA. (See §§ 21067 [" 'Lead agency' means the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment."], 21063 [" 'Public agency' includes any state agency, board, or commission, any county, city and county, city, regional agency, public district, redevelopment agency, or other political subdivision."].)

[7] "The CEQA Guidelines, promulgated by the state's Resources Agency, are authorized by Public Resources Code section 21083. In interpreting CEQA, we accord the Guidelines great

"(a) 'Approval' means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person. The exact date of approval of any project is a matter determined by each public agency according to its rules, regulations, and ordinances. Legislative action in regard to a project often constitutes approval.

"(b) With private projects, approval occurs upon the earliest commitment to issue or the issuance by the public agency of a discretionary contract, grant, subsidy, loan, or other form of financial assistance, lease, permit, license, certificate, or other entitlement for use of the project." (Cal. Code Regs., tit. 14, § 15352, subds. (a), (b).)

CEQA Guidelines section 15004, subdivision (b) observes that "[c]hoosing the precise time for CEQA compliance involves a balancing of competing factors. EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment." (Cal. Code Regs., tit. 14, § 15004, subd. (b).)[8]

■ This court has on several occasions addressed the timing of environmental review under CEQA, emphasizing in each case the same policy balance outlined in CEQA Guidelines section 15004, subdivision (b). In *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68 [118 Cal.Rptr. 34, 529 P.2d 66] (*No Oil, Inc.*), discussing whether the proper scope of an EIR included possible related future actions, we quoted this observation from a federal decision: " 'Statements must be written late enough in the development process to contain meaningful information, but they must be written early enough so that whatever information is contained can practically serve as an

weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5 [53 Cal.Rptr.3d 821, 150 P.3d 709].)

[8] The parties' briefs frame the timing issue here in two ways: (1) Did City, in May and August of 2004, *approve* the 1343 Laurel project and (2) was the contingent agreement to convey and develop 1343 Laurel itself a *project*? While this opinion will discuss some relevant decisions on the definition of a project, it largely follows the first formulation, asking whether City approved the project. As section 15378 of the CEQA Guidelines explains: "(a) 'Project' means the whole of an action, which has a potential for resulting in [an environmental change.] [¶] . . . [¶] (c) The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Cal. Code Regs., tit. 14, § 15378.) The "project" in this case is the redevelopment of 1343 Laurel, not any of the individual steps City took to approve it. City and Laurel Place do not dispute the redevelopment of 1343 Laurel is a project requiring evaluation in an EIR; they disagree with Save Tara only on the required timing of that EIR process.

input into the decision making process.' " (*Id.* at p. 77, fn. 5.) We again quoted this formulation of the general issue in *Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779 [187 Cal.Rptr. 398, 654 P.2d 168] (*Fullerton*), which considered whether a particular action was a "project" for CEQA purposes, adding, with what has turned out to be an understatement, that "[t]he timing of an environmental study can present a delicate problem." (*Fullerton*, at p. 797.)

In *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376 [253 Cal.Rptr. 426, 764 P.2d 278] (commonly known as *Laurel Heights I*), again discussing the proper scope of an EIR regarding future actions, we summed up the issue and attempted to state a rule, as follows: "We agree that environmental resources and the public fisc may be ill served if the environmental review is too early. On the other hand, the later the environmental review process begins, the more bureaucratic and financial momentum there is behind a proposed project, thus providing a strong incentive to ignore environmental concerns that could be dealt with more easily at an early stage of the project. . . . For that reason, ' "EIRs should be prepared as early in the planning process as possible to enable environmental considerations to influence project, program or design." ' " (*Id.* at p. 395.)[9] We also observed that at a minimum an EIR must be performed before a project is approved, for "[i]f postapproval environmental review were allowed, EIR's would likely become nothing more than *post hoc* rationalizations to support action already taken." (*Laurel Heights I*, at p. 394.)

■ This court, like the CEQA Guidelines, has thus recognized two considerations of legislative policy important to the timing of mandated EIR preparation: (1) that CEQA not be interpreted to require an EIR before the project is well enough defined to allow for meaningful environmental evaluation; and (2) that CEQA not be interpreted as allowing an EIR to be delayed beyond the time when it can, as a practical matter, serve its intended function of informing and guiding decision makers.

The CEQA Guidelines define "approval" as "the decision by a public agency which commits the agency to a definite course of action in regard to a project." (Cal. Code Regs., tit. 14, § 15352, subd. (a).) The problem is to determine when an agency's favoring of and assistance to a project ripens into a "commit[ment]." To be consistent with CEQA's purposes, the line must be drawn neither so early that the burden of environmental review

---

[9] In the recent decision of *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra,* 40 Cal.4th at page 441, discussing the extent to which a large housing project's EIR was required to address water sources for the project's later phases, we reiterated *Laurel Heights I*'s admonition that environmental analysis not be delayed to the point where " 'bureaucratic and financial momentum' " rendered it practically moot.

impedes the exploration and formulation of potentially meritorious projects, nor so late that such review loses its power to influence key public decisions about those projects.

Drawing this line raises predominantly a legal question, which we answer independently from the agency whose decision is under review. While judicial review of CEQA decisions extends only to whether there was a prejudicial abuse of discretion, "an agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence. (§ 21168.5.) Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161]), we accord greater deference to the agency's substantive factual conclusions." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra,* 40 Cal.4th at p. 435.)

A claim, like Save Tara's here, that the lead agency approved a project with potentially significant environment effects *before* preparing and considering an EIR for the project "is predominantly one of improper procedure" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra,* 40 Cal.4th at p. 435) to be decided by the courts independently. The claim goes not to the validity of the agency's factual conclusions but to the required timing of its actions. Moreover, as noted above (fn. 8, *ante*), the timing question may also be framed by asking whether a particular agency action is in fact a "project" for CEQA purposes, and that question, we have held, is one of law. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 382 [60 Cal.Rptr.3d 247, 160 P.3d 116]; *Fullerton, supra,* 32 Cal.3d at p. 795.)[10]

Considering the timing issue as one of legally proper procedure does not remove all logistical discretion from agencies; it merely sets an outer limit to how long EIR preparation may be delayed. To accord overly deferential

---

[10] In *Mount Sutro Defense Committee v. Regents of University of California* (1978) 77 Cal.App.3d 20, 40 [143 Cal.Rptr. 365], the Court of Appeal remarked that "the determination of the earliest feasible time [for environmental review] is to be made initially by the agency itself, which decision must be respected in the absence of manifest abuse." (Accord, *Stand Tall on Principles v. Shasta Union High Sch. Dist.* (1991) 235 Cal.App.3d 772, 780 [1 Cal.Rptr.2d 107]; see also *City of Vernon v. Board of Harbor Comrs.* (1998) 63 Cal.App.4th 677, 690 [74 Cal.Rptr.2d 497] ["the timing of an EIR is committed to the discretion and judgment of the agency . . ."].) To the extent these opinions contradict our determination that postponement of an EIR until after project approval constitutes procedural error that is independently reviewable, we disapprove them.

review of agencies' timing decisions could allow agencies to evade CEQA's central commands. While an agency may certainly adjust its rules so as to set "[t]he exact date of approval" (Cal. Code Regs., tit. 14, § 15352, subd. (a)), an agency has no discretion to define approval so as to make its commitment to a project precede the required preparation of an EIR.

### III. Development Agreements Contingent on CEQA Compliance

■ The May 3 draft agreement and August 9 executed agreement conditioned City's obligation to convey the property to Laurel Place for development on all applicable requirements of CEQA having been satisfied. City and Laurel Place contend such a CEQA compliance condition on an agreement to convey or develop property eliminates the need for preparation of an EIR (or any other CEQA document) before an agency approves the agreement. In contrast, Save Tara, quoting the Court of Appeal, maintains that permitting a CEQA compliance condition to postpone environmental review until after an agreement on the project has been reached would render the EIR requirement a "dead letter." We adopt an intermediate position: A CEQA compliance condition can be a legitimate ingredient in a preliminary public-private agreement for exploration of a proposed project, but if the agreement, viewed in light of all the surrounding circumstances, commits the public agency as a practical matter to the project, the simple insertion of a CEQA compliance condition will not save the agreement from being considered an approval requiring prior environmental review.

As previously noted, the CEQA Guideline defining "approval" states that "[w]ith private projects, approval occurs upon the earliest commitment to issue or the issuance by the public agency of a discretionary contract, grant, subsidy, loan, or other form of financial assistance, lease, permit, license, certificate, or other entitlement for use of the project." (Cal. Code Regs., tit. 14, § 15352, subd. (b).)[11] On its face, this regulatory definition suggests a public agency's execution of a contract to convey a property for development would constitute approval of the development project. City and Laurel Place rely on two decisions holding agreements not to be approvals for CEQA purposes when conditioned on later CEQA compliance.

In *Stand Tall on Principles v. Shasta Union High Sch. Dist., supra,* 235 Cal.App.3d 772 (*Stand Tall*), a school district board passed resolutions choosing the site for a new high school from a group of finalists and authorizing the district administration to purchase the property; any offer to

---

[11] The guideline derives in part from Public Resources Code section 21065, which defines "project" as including a private activity supported by public contracts, grants, or other assistance, or requiring issuance of a public permit, license, or other entitlement. (*Id.,* subds. (b), (c).)

purchase "was to be made contingent upon completion of the EIR process and final state approval." (*Id.* at p. 777.) The appellate court rejected a claim the EIR should have been done before selecting the preferred school site, reasoning that "the Board's resolutions regarding the site selection do not constitute an 'approval' under CEQA because they do not commit the District to a definite course of action since they are expressly made contingent on CEQA compliance." (*Id.* at p. 781, italics omitted.)

In *Concerned McCloud Citizens v. McCloud Community Services Dist.* (2007) 147 Cal.App.4th 181 [54 Cal.Rptr.3d 1] (*McCloud*), a district executed an agreement with a commercial spring water bottler for exclusive rights to bottle and sell water from the district's sources, contingent on, among other things, the district and the bottler " 'completing, during the Contingency Period, proceedings under CEQA in connection with the Project, and the expiration of the applicable period for any challenge to the adequacy of District's and [the bottler's] compliance with CEQA without any challenge being filed.' " (*Id.* at p. 188.) Relying in part on *Stand Tall*, the *McCloud* court held no EIR was required before the district executed the contingent bottling agreement. The agreement was subject to several " 'ifs,' " the court reasoned, continuing: "The biggest 'if' in the agreement however is *if* all discretionary permits, expressly defined as including CEQA documentation, review and approvals, along with the final adjudication of any legal challenges based on CEQA, are secured and all environmental, title, physical, water quality and economic aspects of the project are assessed." (*McCloud*, at p. 193.)

Without questioning the correctness of *Stand Tall* and *McCloud* on their facts, we note that each case involved particular circumstances limiting the reach of its logic; neither convinces us a broad rule exists permitting EIR preparation to be postponed in all circumstances by use of a CEQA compliance condition.

In *McCloud*, the court relied in part on the agreement's lack of information as to the springs that would be exploited, the site of the bottling plant, how the water would be transported, and other details essential to environmental analysis of the project. Without that information, the court concluded, "preparation of an EIR would be premature. Any analysis of potential environmental impacts would be wholly speculative and essentially meaningless." (*McCloud*, *supra*, 147 Cal.App.4th at p. 197.) In the terms used by the CEQA Guidelines to define "approval"—"the decision by a public agency which commits the agency to a definite course of action" (Cal. Code Regs, tit. 14, § 15352, subd. (a))—*McCloud* thus speaks as much to *definiteness* as to commitment and does not establish that a conditional agreement for development never constitutes approval of the development.

■ *Stand Tall, supra,* 235 Cal.App.3d 772, involved an agreement to purchase property, an activity that, as a practical matter in a competitive real estate market, may sometimes need to be initiated before completing CEQA analysis. The CEQA Guidelines accommodate this need by making an exception to the rule that agencies may not "make a decision to proceed with the use of a site for facilities which would require CEQA review" before conducting such review; the exception provides that "agencies may designate a preferred site for CEQA review and may enter into land acquisition agreements when the agency has conditioned the agency's future use of the site on CEQA compliance." (Cal. Code Regs., tit. 14, § 15004, subd. (b)(2)(A).) The Guidelines' exception for land purchases is a reasonable interpretation of CEQA, but it should not swallow the general rule (reflected in the same regulation) that a development decision having potentially significant environmental effects must be *preceded,* not *followed,* by CEQA review. (See *Laurel Heights I, supra,* 47 Cal.3d at p. 394 ["A fundamental purpose of an EIR is to provide decision makers with information they can use in deciding *whether* to approve a proposed project, not to inform them of the environmental effects of projects that they have already approved."].)

City and Laurel Place apparently would limit the "commit[ment]" that constitutes approval of a private project for CEQA purposes (Cal. Code Regs., tit. 14, § 15352, subd. (a)) to unconditional agreements irrevocably vesting development rights. In their view, "[t]he agency commits to a definite course of action . . . by agreeing to be legally bound to take that course of action." (*City of Vernon v. Board of Harbor Comrs., supra,* 63 Cal.App.4th at p. 688.) On this theory, any development agreement, no matter how definite and detailed, even if accompanied by substantial financial assistance from the agency and other strong indications of agency commitment to the project, falls short of approval so long as it leaves final CEQA decisions to the agency's future discretion.

■ Such a rule would be inconsistent with the CEQA Guidelines' definition of approval as the agency's *"earliest* commitment" to the project. (Cal. Code Regs., tit. 14, § 15352, subd. (b), italics added.) Just as CEQA itself requires environmental review before a project's approval, not necessarily its *final* approval (Pub. Resources Code, §§ 21100, 21151), so the guideline defines "approval" as occurring when the agency *first* exercises its discretion to execute a contract or grant financial assistance, not when the *last* such discretionary decision is made.

Our own decisions are to the same effect: we have held an agency approved a project even though further discretionary governmental decisions would be needed before any environmental change could occur. (See *Muzzy Ranch Co. v. Solano County Airport Land Use Com., supra,* 41 Cal.4th at

p. 383 [adoption of airport land use plan held to be a project even though it directly authorized no new development]; *Fullerton, supra,* 32 Cal.3d at p. 795 [adoption of school district succession plan held to be a project even though "further decisions must be made before schools are actually constructed . . ."]; *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 279, 282 [118 Cal.Rptr. 249, 529 P.2d 1017] [regional agency's approval of annexation by city held to be a project even though further approvals, including zoning changes, would be needed for property development to occur].) Though these decisions framed the question as whether certain agency steps constituted projects, rather than whether the agency had approved a project, they stand for the principle that CEQA review may not always be postponed until the last governmental step is taken.

Moreover, limiting approval to unconditional agreements that irrevocably vest development rights would ignore what we have previously recognized, that postponing environmental analysis can permit "bureaucratic and financial momentum" to build irresistibly behind a proposed project, "thus providing a strong incentive to ignore environmental concerns." (*Laurel Heights I, supra,* 47 Cal.3d at p. 395.)

A public entity that, in theory, retains legal discretion to reject a proposed project may, by executing a detailed and definite agreement with the private developer and by lending its political and financial assistance to the project, have as a practical matter committed itself to the project. When an agency has not only expressed its inclination to favor a project, but has increased the political stakes by publicly defending it over objections, putting its official weight behind it, devoting substantial public resources to it, and announcing a detailed agreement to go forward with the project, the agency will not be easily deterred from taking whatever steps remain toward the project's final approval.

For similar reasons, we have emphasized the practical over the formal in deciding whether CEQA review can be postponed, insisting it be done early enough to serve, realistically, as a meaningful contribution to public decisions. (See *Fullerton, supra,* 32 Cal.3d at p. 797 ["as a practical matter," school district succession plan was a project requiring review]; *No Oil, Inc., supra,* 13 Cal.3d at p. 77, fn. 5 [" 'Statements must be written . . . early enough so that whatever information is contained can practically serve as an input into the decision making process.' "]; see also *Citizens for Responsible Government v. City of Albany* (1997) 56 Cal.App.4th 1199, 1221 [66 Cal.Rptr.2d 102] [CEQA review should not be delayed to the point where it would "call for a burdensome reconsideration of decisions already made"].) The full consideration of environmental effects CEQA mandates must not be reduced " 'to a process whose result will be largely to generate paper, to

produce an EIR that describes a journey whose destination is already predetermined.' " (*Natural Resources Defense Council, Inc. v. City of Los Angeles* (2002) 103 Cal.App.4th 268, 271 [126 Cal.Rptr.2d 615].)

We note as well that postponing EIR preparation until after a binding agreement for development has been reached would tend to undermine CEQA's goal of transparency in environmental decisionmaking. Besides informing the agency decision makers themselves, the EIR is intended "to demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action." (*No Oil, Inc., supra,* 13 Cal.3d at p. 86; accord, *Laurel Heights I, supra,* 47 Cal.3d at p. 392.) When an agency reaches a binding, detailed agreement with a private developer and publicly commits resources and governmental prestige to that project, the agency's reservation of CEQA review until a later, final approval stage is unlikely to convince public observers that before committing itself to the project the agency fully considered the project's environmental consequences. Rather than a "document of accountability" (*Laurel Heights I,* at p. 392), the EIR may appear, under these circumstances, a document of post hoc rationalization.

On the other hand, we cannot agree with the suggestion of the Court of Appeal, supported by Save Tara, that any agreement, conditional or unconditional, would be an "approval" requiring prior preparation of CEQA documentation if at the time it was made the project was sufficiently well defined to provide " 'meaningful information for environmental assessment.' " (*Citizens for Responsible Government v. City of Albany, supra,* 56 Cal.App.4th at p. 1221, quoting Cal. Code Regs., tit. 14, § 15004, subd. (b).) On this theory, once a private project had been described in sufficient detail, *any* public-private agreement related to the project would require CEQA review.

■ This rule would be inconsistent with the CEQA Guidelines' definition of approval as involving a "commit[ment]" by the agency. (Cal. Code Regs., tit. 14, § 15352, subd. (a).) Agencies sometimes provide preliminary assistance to persons proposing a development in order that the proposal may be further explored, developed or evaluated. Not all such efforts require prior CEQA review. (See, e.g., Cal. Code Regs., tit. 14, § 15262 [conduct of feasibility or planning studies does not require CEQA review].) Moreover, privately conducted projects often need some form of government consent or assistance to get off the ground, sometimes long before they come up for formal approval. Approval, within the meaning of sections 21100 and 21151, cannot be equated with the agency's mere interest in, or inclination to support, a project, no matter how well defined. "If having high esteem for a project before preparing an environmental impact report (EIR) nullifies the process, few public projects would withstand judicial scrutiny, since it is

inevitable that the agency proposing a project will be favorably disposed toward it." (*City of Vernon v. Board of Harbor Comrs., supra,* 63 Cal.App.4th at p. 688.)

As amicus curiae League of California Cities explains, cities often reach purchase option agreements, memoranda of understanding, exclusive negotiating agreements, or other arrangements with potential developers, especially for projects on public land, before deciding on the specifics of a project. Such preliminary or tentative agreements may be needed in order for the project proponent to gather financial resources for environmental and technical studies, to seek needed grants or permits from other government agencies, or to test interest among prospective commercial tenants. While we express no opinion on whether any particular form of agreement, other than those involved in this case, constitutes project approval, we take the League's point that requiring agencies to engage in the often lengthy and expensive process of EIR preparation before reaching even preliminary agreements with developers could unnecessarily burden public and private planning. CEQA review was not intended to be only an afterthought to project approval, but neither was it intended to place unneeded obstacles in the path of project formulation and development.

In addition to the regulatory definition of "approval" quoted earlier (Cal. Code Regs., tit. 14, § 15352, subd. (b)), Save Tara relies on *Citizens for Responsible Government v. City of Albany, supra,* 56 Cal.App.4th 1199 (*Citizens for Responsible Government*) for the principle that an EIR must be prepared before a public agency executes a detailed agreement for development. In that case, the city council decided to place before the voters a proposal for development of a gaming facility at a racetrack; included in the proposal was an agreement with the private developer setting out details of the proposed facility and its operation. (*Id.* at p. 1206.) Although the agreement called for the developer to submit any studies needed " 'to address any potential adverse environmental impact of the Project' " and provided that " '[a]ll reasonably feasible mitigation measures shall become conditions' " of the city's implementation agreement (*id.* at pp. 1219–1220), the appellate court held the city council had approved the project, for CEQA purposes, by putting it on the ballot, and thus the agreed-to environmental analysis came too late: "[T]he appropriate time to introduce environmental considerations into the decision making process was during the negotiation of the development agreement. Decisions reflecting environmental considerations could most easily be made when other basic decisions were being made, that is, during the early stage of 'project conceptualization, design and planning.' Since the development site and the general dimensions of the project were known from the start, there was no problem in providing 'meaningful information for environmental assessment.' At this early stage, environmental review would be an integral part of the decisionmaking

process. Any later environmental review might call for a burdensome reconsideration of decisions already made and would risk becoming the sort of '*post hoc* rationalization[] to support action already taken,' which our high court disapproved in [*Laurel Heights I*]." (*Citizens for Responsible Government*, at p. 1221.)

Again, without questioning the correctness of this decision on its facts, we find it falls short of demonstrating a general rule against use of conditional agreements to postpone CEQA review. The development agreement in *Citizens for Responsible Government*, once approved by the voters, vested the developer with the right to build and operate a card room within particular parameters set out in the agreement. The city had thus "contracted away its power to consider the full range of alternatives and mitigation measures required by CEQA" and had precluded consideration of a "no project" option. (*Citizens for Responsible Government*, *supra*, 56 Cal.App.4th at pp. 1221–1222.) "Indeed, the purpose of a development agreement is to provide developers with an assurance that they can complete the project. After entering into the development agreement with [the developer], the City is not free to reconsider the wisdom of the project in light of environmental effects." (*Id.* at p. 1223.)[12]

 Desirable, then, as a bright-line rule defining when an approval occurs might be, neither of those proposed—the execution of an *unconditional* agreement irrevocably vesting development rights, or of *any* agreement for development concerning a well-defined project—is consistent with CEQA's interpretation and policy foundation. Instead, we apply the general principle that before conducting CEQA review, agencies must not "take any action" that significantly furthers a project "in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project." (Cal. Code Regs., tit. 14, § 15004, subd. (b)(2)(B); accord, *McCloud*, *supra*, 147 Cal.App.4th at p. 196 [agreement not project approval because, inter alia, it "did not restrict the District's discretion to consider any and all mitigation measures, including the 'no project' alternative"]; *Citizens for Responsible Government*, *supra*, 56 Cal.App.4th at p. 1221 [development agreement was project approval because it limited city's power "to consider the full range of alternatives and mitigation measures required by CEQA"].)

---

[12] *Citizens for Responsible Government*'s references to a "development agreement" were to development agreements as described in Government Code section 65865.2, which allows for only such conditions as "shall not prevent development of the land for the uses and to the density or intensity of development set forth in the agreement." The purpose of such agreements is to give "[a]ssurance to the applicant for a development project that upon approval of the project, the applicant may proceed with the project in accordance with existing policies, rules and regulations . . . ." (Gov. Code, § 65864, subd. (b); see *Citizens for Responsible Government*, *supra*, 56 Cal.App.4th at pp. 1213–1214.)

In applying this principle to conditional development agreements, courts should look not only to the terms of the agreement but to the surrounding circumstances to determine whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project. (See Cal. Code Regs, tit. 14, § 15126.6, subd. (e).) In this analysis, the contract's conditioning of final approval on CEQA compliance is relevant but not determinative.

■ A frequently cited treatise on CEQA (Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (11th ed. 2006)) summarizes this approach in a useful manner. "First, the analysis should consider whether, in taking the challenged action, the agency indicated that it would perform environmental review before it makes any further commitment to the project, and if so, whether the agency has nevertheless effectively circumscribed or limited its discretion with respect to that environmental review. Second, the analysis should consider the extent to which the record shows that the agency or its staff have committed significant resources to shaping the project. If, as a practical matter, the agency has foreclosed any meaningful options to going forward with the project, then for purposes of CEQA the agency has 'approved' the project." (*Id.* at p. 71.) As this passage suggests, we look both to the agreement itself and to the surrounding circumstances, as shown in the record of the decision, to determine whether an agency's authorization or execution of an agreement for development constitutes a "decision . . . which commits the agency to a definite course of action in regard to a project." (Cal. Code Regs., tit. 14, § 15352.)

■ Our analysis does not require CEQA analysis before a definite project has been formulated and proposed to the agency. An agency cannot be deemed to have approved a project, within the meaning of sections 21100 and 21151, unless the proposal before it is well enough defined "to provide meaningful information for environmental assessment." (Cal. Code Regs., tit. 14, § 15004, subd. (b).) Moreover, when the prospect of agency commitment mandates environmental analysis of a large-scale project at a relatively early planning stage, before all the project parameters and alternatives are reasonably foreseeable, the agency may assess the project's potential effects with corresponding generality. With complex or phased projects, a staged EIR (Cal. Code Regs., tit. 14, § 15167) or some other appropriate form of tiering (see *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1170 [184 P.3d 709]; *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra,* 40 Cal.4th at p. 431) may be used to postpone to a later planning stage the evaluation of those project details that are not reasonably foreseeable when the agency first approves the project.

IV. *Application to City's Decisions*

We turn finally to whether the city council's approval of the draft agreement on May 3, 2004, and the city manager's execution of the revised agreement on August 9 of the same year constituted approval of the 1343 Laurel project for purposes of sections 21100 and 21151. From the agreements and the surrounding circumstances, we conclude City did approve the 1343 Laurel project in substance, though it reserved some of the project's design details for later environmental analysis and final decision.

The contract between City and Laurel Place demonstrates City's commitment to the project. Both the May 3 draft and the August 9 executed agreements forthrightly stated their purpose was to "cause the reuse and redevelopment" of 1343 Laurel in accordance with the project as outlined in the agreements and in the earlier HUD grant application. The city council's May 3 resolution, similarly, stated the intent to "facilitate development of the project"—while allowing further public input on "the design of project elements."

In both versions of the agreement, moreover, City agreed to initially lend the developer nearly half a million dollars, a promise *not* conditioned on CEQA compliance. This predevelopment portion was to be advanced in the first phase of the agreement's performance, before EIR approval and issuance of other final approvals, and was to be repaid from project receipts over a period of up to 55 years. If City did not give final approval to the project, therefore, it would not be repaid. For a relatively small government like City's, this was not a trivial outlay, and it would be wasted unless City gave final approval to the project in some form.

While both versions of the agreement conditioned conveyance of the property and disbursement of the second half of the loan on CEQA compliance, among other conditions, the May 3 draft agreement significantly circumscribed City's remaining authority in this regard. Under the draft agreement, whether CEQA requirements had been met was to be "reasonably determined by the City Manager," language that could have left City open to charges it acted unreasonably, had it ultimately declined to certify the EIR or make any needed CEQA findings.

In addition, the May 3 draft agreement, in setting the condition that all "requirements of CEQA" be "satisfied," arguably left open the question whether City remained free to find that the EIR was legally adequate and yet to reject the project on substantive environmental grounds. An EIR that

"satisfies" CEQA "requirements" may nonetheless demonstrate the project carries with it significant immitigable adverse effects. The May 3 draft agreement's condition does not clearly encompass the possibility that in such a situation City could decline to find, pursuant to section 21081, subdivision (b), that the project's benefits outweigh such immitigable effects.

Finally, the May 3 draft agreement had no provision for appealing to the city council the city manager's decision on, or waiver of, CEQA compliance. Such a delegation of the council's authority was itself an impermissible attempt to approve the project without prior CEQA review. (See *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 307 [248 Cal.Rptr. 352] [permit condition requiring applicant to submit environmental study to the planning commission and adopt any mitigation measures formulated by commission staff was an improper delegation of CEQA responsibility to staff and an impermissible postponement of environmental review].)

After Save Tara sued, alleging some of these same flaws in the May 3 draft agreement, City staff revised the agreement to repair them. Under the August 9 executed agreement, the city manager no longer had authority to determine or waive CEQA compliance, and City's "complete discretion" over CEQA matters was expressly acknowledged. But the city council had already approved the May 3 draft agreement, by which it had shown a willingness to give up further authority over CEQA compliance in favor of dependence on the city manager's determination. Given that history, as well as the other circumstances discussed below, City's "apprehensive citizenry" (*No Oil, Inc., supra*, 13 Cal.3d at p. 86) could be forgiven if they were skeptical as to whether the city council would give adverse impacts disclosed in the EIR full consideration before finally approving the project.

Circumstances surrounding City's approval of the agreements confirm City's commitment to the 1343 Laurel project. In aid of Laurel Place's HUD grant application, the city manager told the federal agency City "has approved the sale of the property" and "will commit" up to $1 million in financial aid. Once the grant was awarded, City's mayor announced it "will be used" for Laurel Place's project, and the City newsletter stated that, using the grant, City and Laurel Place "will redevelop the property." City officials told residents who opposed the project that while "variations" on the proposal would be entertained, City "must continue on a path that fulfills this obligation" to redevelop the property for senior housing. Similarly, at the May 3, 2004, city council meeting, City's housing manager stated that while there were "options to consider" regarding project design, options for other

uses of the property (as a park, library, or cultural center) had already been ruled out.[13]

Finally, City proceeded with tenant relocation on the assumption the property would be redeveloped as in the proposed project. After HUD awarded the grant, City's housing manager told a tenant that she would be relocated, though not for a year or so. Around the same time, other tenants reported being contacted by relocation consultants, who told them they would soon be given one-year notices. As part of its May 3, 2004, resolution, the city council authorized the predevelopment loan in order to, among other things, "begin the process of working with tenants to explore relocation options." The May 3 draft and August 9 executed agreements provided that Laurel Place would "complete the relocation of tenants" in the agreement's first performance phase, that is, *before* final project approval was given and the property conveyed to Laurel Place. A staff report on the May 3 draft agreement stated that relocation notices, with a one-year period, would be sent shortly after the agreement was executed. The August 9 executed agreement further specified the process was to begin within 30 days.

Relocation of tenants is a significant step in a redevelopment project's progress, and one that is likely to be irreversible. City's willingness to begin that process as soon as the conditional development agreement was executed, and to complete it before certifying an EIR and finally approving the project, tends strongly to show that City's commitment to the 1343 Laurel project was not contingent on review of an EIR.

■ In summary, City's public announcements that it was determined to proceed with the development of low-income senior housing at 1343 Laurel, its actions in accordance with that determination by preparing to relocate tenants from the property, its substantial financial contribution to the project, and its willingness to bind itself, by the May 3 draft agreement, to convey the property if the developer "satisfied" CEQA's "requirements, as reasonably determined by the City Manager," all demonstrate that City committed itself to a definite course of action regarding the project before fully evaluating its environmental effects. That is what sections 21100 and 21151 prohibit.

---

[13] At oral argument, counsel for City and Laurel Place urged strenuously that expressions of enthusiasm for a project by an agency's staff members should not be confused with official approval of a project. We agree. In isolation, such statements could rarely, if ever, be deemed approvals for CEQA purposes. Here, of course, we weigh statements by City officials not in isolation but as one circumstance shedding light on the degree of City's commitment when it approved the May 3 and August 9 agreements. It bears noting, as well, that one of the statements upon which we rely was a communication from City's mayor, another appeared in an official City newsletter, and others were from City's housing manager, who, having been named in the mayor's announcement as the contact person for residents with questions about the proposed development, had apparent authority to speak for City on this topic.

CONCLUSION

For the reasons given above, we agree with the Court of Appeal that City must be ordered to "declare void its approval of the May and August 2004 Agreements" and to reconsider those decisions in light of a legally adequate EIR for the project. (See § 21168.9, subd. (a)(1).) If that reconsideration leads to approval of the project, City must make any appropriate findings under section 21081.

Unlike the Court of Appeal, however, we do not believe City necessarily must prepare a new EIR before reconsidering its approval of the project. The parties agree City certified a final EIR for the project in 2006, during pendency of this appeal, and Save Tara did not judicially challenge that EIR's legal adequacy.

The 2006 EIR was prepared after City approved the May 3 and August 9, 2004, agreements, which approvals must be now vacated. To the extent the 2006 EIR's discussion of project alternatives and mitigation measures was premised on City's 2004 approvals, that discussion may need revision. Moreover, by the time of our remand more than two years will have passed since the EIR was certified in October 2006. Because of both these factors, it is possible that "[s]ubstantial changes [have] occur[red] with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report" or that "[n]ew information, which was not known and could not have been known at the time the environmental impact report was certified as complete, [has] become[] available." (Pub. Resources Code, § 21166, subds. (b), (c); see also Cal. Code Regs., tit. 14, §§ 15162, 15163 [subsequent and supplemental EIR's].) Whether this is so must be decided in the first instance by City and reviewed by the superior court on a substantial evidence standard. (See *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 704 [7 Cal.Rptr.3d 868].)

This matter must therefore be returned to the superior court for that court (1) to order City to set aside its prior approval of the project; (2) if City decides no subsequent or supplemental EIR is required under section 21166, to review that decision; and (3) to make any other order necessary and proper under section 21168.9.

## DISPOSITION

The judgment of the Court of Appeal is affirmed in part and reversed in part. The matter is remanded to the Court of Appeal for further proceedings consistent with our opinion.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

On December 10, 2008, the opinion was modified to read as printed above.