Filed 8/26/13  Neighbors to Preserve the Waterfront v. City and County of San Francisco  CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NEIGHBORS TO PRESERVE THE WATERFRONT et al., | |
| Plaintiffs and Appellants, | |
| v. | A134220 |
| CITY AND COUNTY OF SAN FRANCISCO et al., | (City & County of San Francisco Super. Ct. No. CPF10510634) |
| Defendants and Respondents; | |
| SAN FRANCISCO WATERFRONT PARTNERS II, LLC, et al., | |
| Real Parties in Interest and Respondents. | |

Development along San Francisco's waterfront has been controversial for decades. The dispute giving rise to this appeal is the latest chapter in that saga.  The subject of the controversy is the 8 Washington Street project (8 Washington project), which proposes to develop land along the Embarcadero that is currently used as a surface parking lot and a private tennis and swim club.  The 8 Washington project would transform the site into condominiums, public open space, and a smaller tennis and swim facility.

The merits of the 8 Washington project are not before this court.  Instead, this appeal focuses on two preliminary actions related to the 8 Washington project—(1) a planning study concerning San Francisco's northern waterfront (Northeast Embarcadero Study or Study), and (2) a five-page term sheet intended to set forth general negotiating principles for the 8 Washington project.  The plaintiffs below sued the City and County

1

of San Francisco (City) contending these actions created bureaucratic and financial momentum that amounts to an approval of the 8 Washington project in violation of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[1] Among other complaints about the planning study and term sheet, plaintiffs object to proposals to increase the allowable building heights at the project site.

The trial court rejected plaintiffs' contentions and ruled in favor of the City. Because we conclude the challenged actions do not constitute approvals requiring prior CEQA review, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Description and Background of Project Site*

The 8 Washington project site is located along the Embarcadero near the ferry building in San Francisco. The site is in the shape of a right triangle and comprises 3.2 acres of land bounded by the Embarcadero, Washington Street, and Drumm Street. The site includes three private parcels owned by the Golden Gateway Center and one public parcel owned by the Port of San Francisco (Port). The parcel owned by the Port is held in public trust and is referred to as "Seawall Lot 351."

Seawall Lot 351 was created by removal of the Embarcadero Freeway after the 1989 earthquake and is currently used as a surface parking lot with 110 parking spaces. Adjacent to Seawall Lot 351 on the parcels owned by the Golden Gateway Center is the Golden Gateway Tennis & Swim Club, a private athletic club that includes nine tennis courts, two swimming pools, a 17-space parking lot, and several buildings.

In 1990, City voters approved Proposition H, which required the Port to initiate a public process to prepare a land use plan for Port properties within 100 feet of San Francisco Bay. This process resulted in the "Port of San Francisco Waterfront Land Use Plan" (Waterfront Plan), which was adopted by the San Francisco Port Commission (Port Commission) after the City's Planning Commission (Planning Commission) certified a final environmental impact report (EIR). Consistent with Proposition H, the Waterfront

---

[1] All further statutory references are to the Public Resources Code unless otherwise specified.

2

Plan serves as the "official land use planning document" for the Port. The Waterfront Plan directs the Port to "[e]xplore the possibility of obtaining economic value from Seawall Lot 351 by combining it with the adjacent Golden Gateway residential site [8 Washington Street] to provide expanded opportunities for mixed residential and commercial development."

### *The 8 Washington Project*

The current effort to develop the 8 Washington project is being pursued by San Francisco Waterfront Partners, LLC, which is a partnership between developer Pacific Waterfront Partners, LLC and the California State Teachers Retirement System (collectively, San Francisco Waterfront Partners). San Francisco Waterfront Partners proposed to combine the Golden Gateway Center parcels with Seawall Lot 351 as one mixed-use project. As originally proposed, the 8 Washington project would have involved replacing the existing parking lot and outdoor tennis and swim facility with two 84-foot tall eight-story buildings containing approximately 170 residential units, ground-floor retail, up to 520 underground parking spaces, an open space corridor accessible to the public, an indoor fitness center, and a new outdoor health club with six tennis courts and two swimming pools.

In December 2006, San Francisco Waterfront Partners submitted a proposal to the Port to acquire the rights to Seawall Lot 351 for inclusion in the 8 Washington project. At the request of San Francisco Waterfront Partners, the Port asked the City's Planning Department to undertake environmental review of the 8 Washington project. In December 2007, the Planning Department issued a notice of preparation of an EIR for the 8 Washington project and released the CEQA initial study to the public for review and comment.

As reflected in a February 2008 memorandum from the Port's executive director to the Port Commission, it was anticipated that a draft EIR for the 8 Washington project would be published in Summer 2008 with hearings before the Planning Commission in Fall 2008. Notwithstanding the commencement of a CEQA process for the 8 Washington project—which included Seawall Lot 351 as part of the proposed development—Port

3

staff concluded there were many "potential development options for [Seawall Lot] 351 [either] as a stand-alone development project or as part of a combined site." Consequently, Port staff recommended a competitive solicitation process for the Seawall Lot 351 property. In response to the staff recommendation, in August 2008 the Port issued a request for proposals (RFP) to develop Seawall Lot 351. As part of the RFP, the Port set forth design and development criteria for the site, which included preserving the "iconic vista" from the ferry building to Coit Tower.

The Port received only one proposal in response to the RFP—from San Francisco Waterfront Partners. The Port sought additional proposals and issued a new RFP in November 2008. This time, it received two proposals—one from San Francisco Waterfront Partners and another from a hospitality partnership. The second group later withdrew.

In early 2009, the Port adopted a resolution awarding San Francisco Waterfront Partners the opportunity to enter into an exclusive negotiation agreement with the Port to explore including Seawall Lot 351 in a mixed-use development in combination with the adjacent site.

*Northeast Embarcadero Study*

The proposal to develop Seawall Lot 351 as part of the 8 Washington project received significant public attention and comment. The then-President of the City's Board of Supervisors David Chiu sent a letter to the Port Commission in February 2009 recommending that it work with the Planning Department to "lead a focused public planning process for the Port's surface parking lots north of Market Street." Supervisor Chiu noted his belief that it was time to consider an update to the Port's Waterfront Plan in light of the "current discourse regarding the development proposal at Seawall Lot 351." Supervisor Chiu's letter stated in part:

> Port development in the northern waterfront is an extremely important issue to many of the residents of my district. In recent years, several Port-initiated development efforts have failed in the face of community opposition. Similar concerns are currently being raised regarding the proposed development at [Seawall Lot] 351 and the future

4

development of seawall lots on the northern waterfront, and I share many of these concerns.

    To address these concerns, I would strongly urge the Port Commission to work with the City's Planning Department to lead a focused public planning process for the Port's surface parking lots north of Market Street. This effort could recommend possible amendments to the Port's Waterfront Land Use Plan and Design and Access Element, and to the San Francisco Planning Code. I urge the Port Commission to condition any negotiations regarding [Seawall Lot] 351 upon the full participation of both the Port and the project proponent in the planning process, and require any development proposal to respond to development guidelines established through the process. . . . [¶] . . .

    I believe that a focused, six to eight month process managed by the Planning Department could foster community consensus for a [Seawall Lot] 351 project and design, as well as for future development along the northern waterfront. The community and Port have legitimate goals and concerns, and I hope that by bringing all stakeholders to the same table, we can build consensus for the future of our waterfront.

In response to Supervisor Chiu's recommendation, the Port Commission funded the Planning Department study referred to as the Northeast Embarcadero Study (Study). Work on the Study began in May 2009 and was completed by May 2010. As part of the Study, the Planning Department hosted three community workshops that elicited over 300 public comments.

On July 8, 2010, the Planning Commission conducted a hearing to consider a resolution recognizing the Northeast Embarcadero Study and urging the Port to take the Study's principles and recommendations into account when considering development in the Study area. Public comments reflected a wide variety of viewpoints and concerns. During the course of the public hearing, the Planning Department director clarified for the Planning Commission that "[t]he action you're taking is not an adoption of a plan. It's a recognition of a study. That's a very important distinction. And you are simply urging the Port Commission to look at that and to consider that in their review of projects. That type of action does not require an environmental analysis in and of itself."

5

At the conclusion of the hearing, the Planning Commission approved a resolution "acknowledg[ing] the work of staff in completing the Northeast Embarcadero Study and recogniz[ing] the design principles and recommendations of the Study for public realm improvements and new development in the area." As set forth in the resolution, "the Planning Commission urge[d] the Port of San Francisco to consider the principles and recommendations proposed in the Northeast Embarcadero Study when considering proposals for new development in the study area . . . ." The resolution concluded by stating it "is not a project approval but represents the Commission's recommendation that the Port and other City departments consider the Planning staff's work performed to create the Northeast Embarcadero Study in future deliberations for development of the area. This Resolution does not commit the Commission to any proposed project or any project that may be proposed in the future. Consistent with CEQA, the Commission may decide to approve or disapprove a project after completion of environmental review and based upon independent review and consideration of any environmental effects caused by such project."

The Northeast Embarcadero Study states that its intent "is to guide the development of properties along the west side of [t]he Embarcadero, from Washington Street to North Point Street, in a common direction." The Study "documents the Planning Department staff recommendations for consideration by the public, the Planning Commission, the Port Commission, and the Board of Supervisors." In addition to a discussion of the background of the Study area, the Study includes an extensive set of design principles and recommendations for development in the Study area.

As relevant here, the Study recommends increasing allowable building heights in portions of the 8 Washington project site. Whereas the 8 Washington project had originally proposed eight-story buildings with a height of 84 feet, the Study recommends a height increase to 130 feet, or the equivalent of a 12-story building, in one-third of the westerly portion of the site. The heights on the remaining two-thirds of the westerly portion of the site would be allowed to go up to 90 feet, or the equivalent of an eight-story building. On the easternmost portion of the site bordering the Embarcadero, the

6

Study recommends reducing building heights to 70 feet, or the equivalent of a six-story building.  The Study suggests placing buildings of the greatest height of 12 stories at the southwestern corner of the site, further away from the Embarcadero where Washington and Drumm Streets meet.  It is acknowledged in the Study that "views that currently exist between the north end of the Ferry Building and Coit Tower would be lost when new development is built on the proposed 8 Washington site," although the Planning Department staff expressed its belief that "this is an appropriate trade-off given the benefits resulting from the development."

### *Term Sheet*

On August 20, 2009, while the Planning Department staff continued its work on the Northeast Embarcadero Study, the Port and San Francisco Waterfront Partners entered into an exclusive negotiation agreement, as the Port Commission had previously authorized.  The exclusive negotiation agreement committed the parties to undertake good faith negotiations to develop a term sheet "intended to set forth general principles for negotiation . . . ."  The term sheet served the purpose of "describ[ing] the basic elements of the Project, site plan, use program, economic parameters, and fundamental terms that will serve as the basis for negotiating the Transaction Documents."

The exclusive negotiation agreement also provided that, in formulating the conceptual terms for the 8 Washington project, San Francisco Waterfront Partners had to ensure that its proposal responded to the recommendations of the Study.  A proposed timeline in the exclusive negotiation agreement anticipated the Port would adopt a term sheet before completion of CEQA review.

As contemplated by the exclusive negotiation agreement, San Francisco Waterfront Partners and the Port negotiated a proposed five-page term sheet (Term Sheet) for the Port Commission's approval.  The Term Sheet consists of an agreement (1) describing the proposed 8 Washington project; (2) establishing financial terms and anticipated funding mechanisms; (3) describing a management plan for the condominiums, open space, commercial space, parking, and health club; (4) listing some of the actions required to approve the 8 Washington project; and (5) requiring that the

7

EIR include an analysis of a hotel alternative, as well as "a full range of appropriate alternatives and mitigation measures [that] must be analyzed under CEQA . . . ." The Term Sheet specifies that it is part of the exclusive negotiation agreement, sets forth the terms that will serve as the basis for negotiating detailed transaction documents, is not intended to be binding until the parties execute the transaction documents, and is subject to completion of environmental review under CEQA.

The Term Sheet proposes constructing two condominium buildings on the 8 Washington project site. The eastern condominium building along the Embarcadero is proposed to be between 48 and 70 feet high. The Term Sheet proposes that the western condominium building will vary between 84 and 136 feet in height. Although these proposed heights are not identical to those recommended in the Northeast Embarcadero Study, the Port staff concluded that the Term Sheet responded to the Study in adjusting the height and massing of the buildings.

On September 28, 2010, the Port Commission adopted a resolution endorsing the Term Sheet. The resolution provides that the "Port Commission will not take any discretionary actions committing the Port to implement the Project, and the provisions of the Term Sheet are not intended and will not become contractually binding on the Port unless and until the Port Commission has reviewed and considered environmental documentation prepared in compliance with [CEQA] for the Project and negotiated and approved final agreements for the Project."

As reflected in the parties' briefs, the EIR process for the 8 Washington project was ongoing during the course of this lawsuit.

### *Procedural History*

The plaintiffs and appellants (plaintiffs) are neighborhood and nonprofit associations that seek to protect the San Francisco waterfront, preserve the Golden Gateway Tennis and Swim Club, protect the character of neighborhoods near the 8 Washington project, and address ongoing housing, transportation, and development issues, among other things. In August 2010, plaintiffs filed a petition for writ of mandate challenging the Planning Commission's resolution recognizing the Northeast

8

Embarcadero Study. Plaintiffs alleged the Planning Commission violated CEQA by adopting the resolution without conducting appropriate environmental review. In a first amended petition, plaintiffs further alleged the Port Commission violated CEQA by approving the Term Sheet without prior environmental review. According to plaintiffs, the actions of the Planning Commission and the Port Commission "effectively conveyed the City's commitment" to adopt the Study's recommendations and precluded "meaningful consideration of project alternatives . . . ."

The trial court denied the petition in its entirety. The court concluded that the Port Commission's approval of the Term Sheet did not commit the Port as a practical matter to approve the 8 Washington project. The court also concluded the resolution recognizing the Northeast Embarcadero Study was not an approval of the 8 Washington project because it did not, either by itself or in conjunction with the Term Sheet, create the type of " 'bureaucratic momentum' " for the project that necessitates environmental review under CEQA. With the court's permission, the parties provided further briefing on the issue of whether the Planning Commission's acknowledgment of the Study constituted a de facto amendment to the Waterfront Plan. The court ultimately concluded that the Planning Commission's resolution was not a de facto amendment to the Waterfront Plan triggering CEQA review. Plaintiffs filed a timely appeal of the judgment.

DISCUSSION

Plaintiffs contend the City violated CEQA by pre-committing to approve the 8 Washington project without certifying an EIR as a result of (1) the Planning Commission resolution to recognize the Northeast Embarcadero Study, and (2) the Port Commission endorsement of the Term Sheet for the 8 Washington project. This appeal is all about the *timing* of environmental review. The parties agree that the California Supreme Court's decision in *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116 (*Save Tara*) provides the operative test for determining what constitutes "approval" of a "project" for purposes of triggering CEQA review. As we explain, under *Save Tara* and its progeny,

9

the actions challenged by plaintiffs do not amount to project approvals requiring prior CEQA review.

## 1. Governing Legal Principles and Standard of Review.

CEQA applies to "discretionary projects proposed to be carried out or approved by public agencies . . . ." (§ 21080, subd. (a).) " 'Project' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (§ 21065.) CEQA's implementing regulations, the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) (Guidelines),[2] provide that the term " '[p]roject' means the whole of an action" (Guidelines, § 15378) and "refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies." (Guidelines, § 15378, subd. (c).) It "does not mean each separate governmental approval." (*Ibid.*)

Under CEQA, all local agencies must "prepare, or cause to be prepared by contract, and certify the completion of, an environmental impact report on any project that they intend to carry out or approve which may have a significant effect on the environment." (§ 21151; see § 21080, subd. (d).) "An environmental impact report is an informational document which, when its preparation is required by this division, shall be considered by every public agency prior to its approval or disapproval of a project." (§ 21061; see Guidelines, § 15004, subd. (a).) "The purpose of an environmental impact report is to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided." (§ 21002.1, subd. (a).)

CEQA applies when a public agency proposes to carry out or approve a project. (§ 21080, subd. (a).) The term "approval" is defined in the Guidelines as "the decision

---

[2] "The CEQA Guidelines, promulgated by the state's Resources Agency, are authorized by Public Resources Code section 21083. In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5.)

by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person." (Guidelines, § 15352, subd. (a).)

In *Save Tara, supra,* 45 Cal.4th 116, the California Supreme Court addressed the question of when a development agreement conditioned upon compliance with CEQA constitutes an "approval" of a project requiring prior environmental review. The project proponents in *Save Tara* maintained that only "unconditional agreements irrevocably vesting development rights" constitute "commitments" that amount to project approval within the meaning of CEQA. (*Id.* at p. 135.) The court rejected that view, reasoning that "[a] public entity that, in theory, retains legal discretion to reject a proposed project may, by executing a detailed and definite agreement with the private developer and by lending its political and financial assistance to the project, have as a practical matter committed itself to the project." (*Ibid.*)

But the *Save Tara* court also rejected the view of the project opponents that "any agreement, conditional or unconditional, would be an 'approval' requiring prior preparation of a CEQA documentation if at the time it was made the project was sufficiently well defined to provide 'meaningful information for environmental assessment.' " (*Save Tara, supra,* 45 Cal.4th at p. 136.) The court explained: Such a "rule would be inconsistent with the CEQA Guidelines' definition of approval as involving a 'commit[ment]' by the agency. [Citation.] Agencies sometimes provide preliminary assistance to persons proposing a development in order that the proposal may be further explored, developed or evaluated. Not all such efforts require prior CEQA review. [Citation.] Moreover, privately conducted projects often need some form of government consent or assistance to get off the ground, sometimes long before they come up for formal approval. Approval, within the meaning of [Public Resources Code] sections 21100 and 21151, cannot be equated with the agency's mere interest in, or inclination to support, a project, no matter how well defined." (*Ibid.*)

The Supreme Court in *Save Tara* declined to adopt a bright-line test for defining when an approval takes place. (*Save Tara, supra,* 45 Cal.4th at p. 138.) Instead, the court applied and elaborated upon the "general principle that before conducting CEQA

11

review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project.' " (*Ibid.*) The critical question based upon all the surrounding circumstances is "whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures, that CEQA would otherwise require to be considered, including the alternative of not going forward with the project." (*Id.* at p. 139.) The court explained that conditioning "final approval on CEQA compliance is relevant but not determinative." (*Ibid.*)

We independently review the predominantly legal question of whether the City's actions with respect to the Northeast Embarcadero Study and the Term Sheet constituted an approval of the 8 Washington project for purposes of CEQA before it conducted the requisite environmental review. (*Save Tara, supra,* 45 Cal.4th at pp. 131-132.)

**2.      The Planning Commission Did Not Approve a Project Under CEQA When It Recognized the Northeast Embarcadero Study and Urged the Port Commission to Consider Its Recommendations.**

     **a.      *The Planning Commission did not, as a practical matter, commit to the 8 Washington project or preclude alternatives.***

Plaintiffs contend that the Planning Commission's recognition of the Northeast Embarcadero Study created "bureaucratic momentum" for the development of the 8 Washington project. Their main complaint is that the Study recommended revised height limits for the 8 Washington project site.

The Study's recommendations are just that—recommendations. The Planning Commission's resolution encourages the Port and the City to consider the recommendations but stops far short of committing the City to amend height limitations in the zoning code or in any other adopted plans. The Study does not commit the Port Commission to approve a project simply because it is consistent with the staff recommendations contained in the Study. In an attempt to show the recommendations are de facto amendments to development guidelines, plaintiffs quote one heading in the

12

Study titled, "Making Sure the Study's Recommendations Are Implemented." However, they fail to note the heading appears in an appendix to the Study summarizing the public input process. In any event, the appendix in which the heading is contained does not describe the recommendations as binding or suggest they will necessarily be implemented.

Plaintiffs emphasize the recommended building height increases to suggest the Study was tailored to accommodate the developer's needs, claiming that staff recommended increasing building heights from eight to twelve stories. The suggestion is inaccurate. While the Study proposes height *increases* on some portions of the 8 Washington project site, it also recommends height *reductions* on portions of the site bordering the Embarcadero. Thus, rather than suggesting staff accommodated San Francisco Waterfront Partners in recommending building heights, the record reveals that the recommendations "reflect the long consideration of the very diverse set of opinion on height expressed by the community in combination with the department's professional opinion."

In an attempt to suggest the Study's goal was to approve the 8 Washington project, plaintiffs cite various interdepartmental emails. Plaintiffs quote an email from the Port's Deputy Director of Waterfront Planning to a Planning Department staff member, purportedly to show that the staff sought to justify a reduction in open space and increase building height limits at the 8 Washington project site. Plaintiffs focus on the statement that, "If the politics of these issues get deferred to the rezoning/[conditional use] application review process, the process would not increase certainty for this project. This is a concern for us."

The concern about a failure to initiate public dialog on controversial projects early in the planning process does not constitute an expression of commitment to the 8 Washington project. The email's author expressed a concern about "sidestep[ping] substantive public dialog and debate" over how various height limit and design issues apply to Seawall Lot 351 and stated it "may be difficult for [San Francisco Waterfront Partners] to figure out whether/how its project design is refined to respond to the

13

planning process outcomes." Thus, viewed in context, the email advocated more public dialog on controversial building height and open space issues and expressed concern that deferring the issues to a later time would be counterproductive. Failing to tackle such disputed issues in the Study would create less "certainty" for *any* proposed use of Seawall Lot 351 and the adjacent Golden Gateway parcels.

Plaintiffs also cite several interdepartmental emails to show that staff referenced both the Study and the 8 Washington project together in the same email. In light of the fact the 8 Washington project site is within the area evaluated by the Study, and that Planning Department staff was involved both in developing the Study and preparing the EIR for the 8 Washington project, it is not particularly surprising that staff would, at times, discuss the Study and the 8 Washington project.

Finally, plaintiffs cite an email from a Port staff member to support the proposition that the Study was directed at facilitating the 8 Washington project. The email reads, in part: "The idea is that 8 Washington would move forward in tandem with the preparation of the Northeast Waterfront Study. Thus far, the sponsor has not submitt[ed] any revised plans or other changes to the project in response to this process. My speculation: They will probably hold off with any revisions until a draft plan is issued (or close to being issued) by our Department, so they don't appear to be jumping the gun or undermining the process." In their appellate brief, plaintiffs conveniently omit the portion of the email in which the staff member offered "speculation" that San Francisco Waterfront Partners would "probably hold off with any revisions . . . ." In any event, given that Supervisor Chiu hoped the Study would forge public consensus and that San Francisco Waterfront Partners agreed as part of the exclusive negotiation agreement to consider and respond to the Study once completed, there is nothing unusual about the developer's decision to await the outcome of the Study before revising its development proposal. Use of the Study to further explore, develop, or evaluate the 8 Washington project hardly constitutes evidence the City committed to the 8 Washington project as a whole or as to any particular features so as to effectively preclude any alternatives or mitigation measures. (See *Save Tara, supra,* 45 Cal.4th at pp. 136-137.)

14

The sparse email evidence relied upon by plaintiffs does not establish that the City had committed to the 8 Washington project or ruled out alternatives. In *Save Tara,* by contrast, there was substantial evidence of the city's commitment to the project, including public statements by the mayor, the city manager, and the housing manager. (*Save Tara, supra,* 45 Cal.4th at pp. 123, 141-142.) The city manager told a federal agency the city had already approved a sale of the affected property and would commit substantial financial resources to the project. (*Id.* at p. 141.) The housing manager reported at a city council meeting that various uses for the property "had already been ruled out." (*Ibid.,* fn. omitted.) And the mayor announced that the city would use federal grant money to redevelop the subject property as proposed. (*Id.* at pp. 123, 141.) The isolated, internal staff emails cited by plaintiffs in this case simply do not reveal that approval of the 8 Washington project was predetermined or that any alternatives had been ruled out.

We conclude the Planning Commission's resolution recognizing the Northeast Embarcadero Study and urging consideration of its recommendations did not, as a practical matter, commit the City to the 8 Washington project or effectively preclude any alternatives or mitigation measures, including the alternative of not going forward with the project. (*Save Tara, supra,* 45 Cal.4th at p. 139.) Therefore, the adoption of the resolution did not constitute a project approval requiring prior CEQA review.

**b.** ***The Northeast Embarcadero Study is not a project requiring an EIR.***

As an alternative to the theory that recognition of the Northeast Embarcadero Study constituted de facto approval of the 8 Washington project, plaintiffs argue that the Study, standing alone, is a project requiring CEQA review because it constitutes a discretionary City action with potentially significant environmental impacts. We disagree.

The Study falls within an exemption for feasibility and planning studies found in Guidelines section 15262, which provides: "A project involving only feasibility or planning studies for possible future actions which the agency, board, or commission has not approved, adopted, or funded does not require the preparation of an EIR or negative declaration but does require consideration of environmental factors. This section does

15

not apply to the adoption of a plan that will have a legally binding effect on later activities." By its plain terms, Guidelines section 15262 applies to the Northeast Embarcadero Study, which does not have legally binding effect and simply contains recommendations for possible future actions that have yet to be approved or funded.

Plaintiffs argue that Guidelines section 15262 does not apply because the sole authority for the Guideline "derives from Public Resources Code sections that address 'funding requests' for planning studies for *state* agencies, boards, or commissions." (See §§ 21102, 21150.) According to plaintiffs, because CEQA Guidelines may not exceed their statutory authority, Guideline section 15262 cannot be applied to *local* agencies such as the City. We are not persuaded.

The CEQA Guidelines are authorized by section 21083 and are entitled to "great weight except where they are *clearly unauthorized or erroneous.*" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra,* 40 Cal.4th at 428, fn. 5, italics added.) Guidelines section 15262 is neither clearly unauthorized nor erroneous. In *Save Tara,* our Supreme Court cited Guidelines section 15262 and explained that some preliminary efforts to further explore, develop, or evaluate proposals do not require CEQA review. (*Save Tara, supra,* 45 Cal.4th at p. 136.) The apparent purpose of the exemption is to avoid costly environmental review under CEQA when a study does no more than contain preliminary, non-binding recommendations. Although the statutory provisions cited as authority for Guidelines section 15262 specifically apply to state agencies (see §§ 21102, 21150), the rationale for the exemption applies equally to local agencies. Plaintiffs do not suggest otherwise. Thus, we conclude Guidelines section 15262 is properly applied to local agencies as well as state agencies.[3]

---

[3] The City seeks judicial notice of documents concerning the adoption of Guidelines section 15262 that purportedly show the state's resources agency specifically intended to include local agencies within the scope of the exemption. As the City acknowledges, because the language of the Guideline unambiguously applies to all public agencies, both state and local, it is unnecessary to resort to such materials to interpret and apply the Guideline. (Cf. *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.*

Plaintiffs claim that advisory planning documents *may* constitute projects under CEQA, citing *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372 and *Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, disapproved on other grounds in *Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 918. Neither case stands for the proposition that mere recommendations are projects pursuant to CEQA. In *Muzzy Ranch,* the Supreme Court rejected the argument that a plan consisted merely of recommendations and instead concluded the plan carried "significant, binding regulatory consequences . . . ." (*Muzzy Ranch, supra,* 41 Cal.4th at p. 384.) Likewise, in *Fullerton Joint Union High School Dist.,* the court held that the challenged plan as a practical matter precluded alternatives and was an "essential step leading to ultimate environmental impact . . . ." (*Fullerton Joint Union High School Dist., supra,* 32 Cal.3d at p. 797.) Here, unlike in the cases relied upon by plaintiffs, the Northeast Embarcadero Study simply contains recommendations and has no binding effect.

**3.      The Port Commission Did Not Approve a Project Under CEQA When It Endorsed the Term Sheet For the 8 Washington Project.**

Plaintiffs contend the Port Commission's approval of the five-page Term Sheet violated CEQA because it "created momentum that does not reasonably allow consideration of alternatives." We reject the contention.

The plain language of the Term Sheet expressly provides that it is not an approval and is not intended to be binding until the parties execute the transaction documents and complete environmental review under CEQA. Likewise, the exclusive negotiation

---

(2005) 133 Cal.App.4th 26, 30.) Consequently, we deny judicial notice of the documents concerning the development of the Guidelines.

  The City also seeks judicial notice of the final EIR for the 8 Washington project. Because the final EIR postdates the judgment on appeal, the City acknowledges the document is not a proper subject of judicial notice but justifies the request as "protective" in the event this court were to grant a similar request by plaintiffs. No such request was filed by plaintiffs, and we would have denied it in any event. Therefore, we deny the City's request for judicial notice of the final EIR.

17

agreement and the Port Commission's resolution endorsing the Term Sheet recognize the preliminary nature of the Term Sheet, which was intended to serve as the basis for negotiating the transaction documents.

In *Cedar Fair, L.P. v. City of Santa Clara* (2011) 194 Cal.App.4th 1150, 1167 (*Cedar Fair*), the appellate court applied *Save Tara* in considering whether adoption of a term sheet constituted an approval of a project. The term sheet in *Cedar Fair* was a 39-page document that included extensive details concerning a proposal to develop a football stadium complex for the San Francisco 49ers in Santa Clara. (*Id.* at p. 1169.) The appellate court concluded the city's approval of the term sheet did not trigger CEQA, despite the large amount of money already invested by the redevelopment agency and the term sheet's high level of detail. (*Id.* at pp. 1167-1173.) As the court explained, "although the term sheet is extremely detailed, it expressly binds the parties to only continue negotiating in good faith. [Citation.] A contract to negotiate an agreement is distinguishable from the ultimate agreement that parties hope to eventually reach." (*Id.* at p. 1171.) The term sheet "merely 'memorialize[d] the preliminary terms' and only mandate[d] that the parties use the term sheet as the 'general framework' for 'good faith negotiations.' " (*Id.* at p. 1170.) The city and redevelopment agency " 'retain[ed] the absolute sole discretion' " under CEQA, including deciding " 'not to proceed with the Stadium project.' " (*Ibid.*) The term sheet specified that it did not " 'create any binding contractual obligations' with respect to the development of the stadium" and acknowledged that a "no-project option was still available." (*Id.* at pp. 1170-1171.)

The Term Sheet here is distinguishable from the term sheet in *Cedar Fair* only because of its brevity. The Term Sheet for the 8 Washington project is a five-page outline of terms, as opposed to the lengthy, detailed term sheet at issue in *Cedar Fair*. However, the term sheets are identical in legal effect—both documents memorialize conceptual terms and commit the agency and developer to continue negotiating in good faith. Neither term sheet obligated the public agency to take any action. From a CEQA perspective, they are indistinguishable.

18

Plaintiffs attempt to distinguish *Cedar Fair* by pointing out that, here, the City was already preparing an EIR for the 8 Washington project when the Port endorsed the Term Sheet. Even if this is a basis for distinguishing *Cedar Fair,* in which it is unclear whether CEQA review was underway at the time the term sheet was approved (see *Cedar Fair, supra,* 194 Cal.App.4th at pp. 1156-1158), it is a distinction without a difference. Regardless of the commencement or status of the 8 Washington project EIR, the fact remains that the Term Sheet approved by the Port Commission was not an approval of a project.

Plaintiffs also argue *Cedar Fair* is distinguishable because the project opponent in that case was a "huge corporation" "with no pretense of environmental concern" pursuing its "admitted financial interest," in contrast to plaintiffs' self-professed civic motives. Again, the claimed distinction is irrelevant to the CEQA analysis. A party's underlying motives and economic resources are immaterial. (Cf. *Maintain Our Desert Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430, 448-449 [CEQA analysis does not turn on party's financial status]; see also *Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 599-600.) We fail to see how the motives of a party challenging a public agency's action bear upon the legal question of whether the action constitutes a project approval. That inquiry necessarily focuses on the substance of the public agency's action and the circumstances surrounding the action rather than the nature of any challenge to the action.

We conclude that the adoption of the Term Sheet did not commit the City as a practical matter to the 8 Washington project or preclude any alternatives or mitigation measures. Together, the Study and the Term Sheet commit the City to do nothing more than to continue to negotiate in good faith, with the benefit of the Study's recommendations. The record is devoid of any evidence that the City or Port has made the kind of financial commitment to the 8 Washington project that would compromise the decision making process. (See *Save Tara, supra,* 45 Cal.4th at p. 142 [city contributed substantial financial assistance to project].) Consequently, plaintiffs failed to establish that the Port Commission's endorsement of the Term Sheet, either alone or in

19

combination with the Planning Commission's recognition of the Study, constituted an approval of a project under CEQA. In reaching this conclusion, we stress that our task in this appeal was limited to assessing the procedural question of whether adoption of the Study and/or Term Sheet constituted an approval of a project under CEQA requiring prior environmental review. We express no view as to the merits of the 8 Washington project.

**DISPOSITION**

The judgment is affirmed. Respondents shall recover their costs on appeal.

_____
McGuiness, P.J.

I concur:


_____
Jenkins, J.

20

**POLLAK, J.**, Concurring. — I believe the analysis of the issues in the majority opinion is correct. However, I reach this conclusion with some misgivings. We cannot be blind to reality. There can be little doubt but that the preparation and implicit approval by San Francisco's Planning Commission of the Northeast Embarcadero Study (the study), to "guide the development of properties" where the 8 Washington Street project is to be located, was a significant step creating "bureaucratic momentum" towards ultimate approval of the project. Those commissioners who voted to "recognize the design principles and recommendations of the study for public realm improvements and new developments in the area" undoubtedly are less likely to disapprove a project incorporating those very principles and recommendations, regardless of what might be disclosed by a subsequently prepared environmental impact report.

Nonetheless, through carefully drawn documentation, the municipal agencies here made unmistakably clear that neither the planning commission's approval of the study nor the San Francisco Port Commission's approval of the term sheet constituted binding commitments. In determining whether a commitment has been made, "courts should look not only to the terms of the agreement but to the surrounding circumstances to determine whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that [the California Environmental Quality Act] would otherwise require to be considered, including the alternative of not going forward with the project." (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 139.) The surrounding circumstances here simply are not sufficient to overcome the import of the documentation. Whatever psychological predisposition to approve a project may result from the endorsement of steps preliminary to final approval, such as the approval of the study's recommendations or of the term sheet incorporating those recommendations, commitment cannot be judged by attempting to read the subjective thoughts of agency officials. Whether an agency realistically has committed itself to proceed with a project must be evaluated by the actions the agency has taken. In *Save Tara,* city officials not only advised the federal government and made public statements indicating the project

1

had been approved, as the majority opinion indicates, but the city had also agreed to lend the developer "nearly half a million dollars" that would not have been repaid if the project was not finally approved (*id.* at p. 140) and the city "proceeded with tenant relocation on the assumption the property would be redeveloped as in the proposed project" (*id.* at p. 142).

Nothing comparable is shown to have occurred here. Other than the costs incurred in preparing the study and negotiating the term sheet, the record reflects no other expenses incurred by the city and no significant action premised on project approval such as was taken in *Save Tara*. This is not enough to justify the supposition that the officials who subsequently will be called upon to exercise their judgment in approving an environmental impact report and the project itself will not fairly consider the impacts disclosed by the report in deciding whether to require mitigation measures to the project and whether to go forward with the project at all.

Moreover, although perhaps not relevant to the analysis of the issue before us, it is worth noting that the extended process by which the planning commission prepared the study renders it highly unlikely that the environmental impact report would bring to light any environmental impacts not disclosed by the study. Whatever one's views on the advisability of raising the height limits for the 8 Washington Street project, it can hardly be suggested that the pros, cons, and alternatives were not aired and considered in the preparation of the study.


_____
Pollak, J.


2