Filed 12/22/15  Save Westwood Village v. The Regents of the University of California CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SAVE WESTWOOD VILLAGE, | B261203 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BS139854) |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court for Los Angeles County, Thomas I. McKnew, Jr., Judge.  Affirmed.

Law Offices of Noel Weiss and Noel W. Weiss for Plaintiff and Appellant.

Meyers, Nave, Riback, Silver & Wilson, Amrit S. Kulkarni, Julia L. Bond and Shiraz D. Tangri for Defendant and Respondent.

This case involves the approval by the Regents of the University of California (the Regents) of the proposed Meyer and Renee Luskin Conference and Guest Center (the Project) on the campus of the University of California, Los Angeles (UCLA).  Appellant Save Westwood Village (Save Westwood) appeals from a judgment denying its petition for writ of mandate challenging that approval under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[1]  The appeal raises four issues:  (1) whether the Regents violated CEQA by committing to the Project before completing the CEQA process; (2) whether the Regents violated CEQA by appropriating funds for a project that was different than the Project evaluated under CEQA; (3) whether the Project approved by the Regents violates the CEQA requirement that only legally feasible alternatives be considered, on the ground that the Project violates the Regents' policies regarding lawful "auxiliary enterprises"; and (4) whether the environmental impact report (the EIR) adequately addressed parking impacts from the Project.

We could have rejected Save Westwood's appellant's opening brief at the outset for its many inadequacies.  (Cal. Rules of Court, rule 8.204(e)(2)(B).)  First, it fails to provide an adequate statement of facts.  (Cal. Rules of Court, rule 8.204(a)(2)(C).)  Although there is a one and a half page section entitled "Statement of Facts," it is more argument than recitation of facts.  Nowhere in the brief is there a coherent discussion of the facts leading to the Regents' approval of the Project and the trial court's denial of Save Westwood's writ petition.  Second, the appellant's opening brief fails to provide citations to the record for most of its factual assertions (and, when it does provide record citations, many of those

---

[1]     Further undesignated statutory references are to the Public Resources Code.

2

citations do not, in fact, support the "fact" for which the citation was provided). (Cal. Rules of Court, rule 8.204(a)(1)(C).) Finally, the brief contains virtually no *legal* analysis supported by citation to legal authority. While it does cite to four cases, it does not discuss the reasoning (or even holdings) of those cases, or attempt to apply the reasoning or holdings to the facts of this case. (Cal. Rules of Court, rule 8.204(a)(1)(B).) Despite these infirmities, for which we could deem Save Westwood's arguments to have been forfeited or abandoned (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 [argument deemed waived for failure to support argument with citations to record]; *Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700 [issue that is not supported by pertinent or cognizable legal argument may be deemed abandoned]), we have considered those arguments and found them lacking on the merits. Accordingly, we affirm the judgment.

**BACKGROUND**

In 2008, UCLA convened a group of deans, staff, and administrators to assess the feasibility of a conference center on or near the UCLA campus. The group explored a variety of alternatives to provide the facilities needed to host national and international conferences, consistent with UCLA's desire to become a global leader in education and research. Those alternatives included using or expanding existing facilities on and off campus, including nearby hotels, and constructing a new conference facility at various locations on campus. While those alternatives were being explored, UCLA retained an experienced hotel and conference center consultant, Pannell Kerr Forster (PKF), in 2009 to assess local and regional conference and lodging markets and demand for academic meetings and events, and to review and augment UCLA's occupancy and operating projections. Based upon PKF's findings, which were updated in 2011, UCLA

3

concluded that it could support a full-service conference center with approximately 250 rooms and 25,000 square feet of meeting space for academic travelers, visiting faculty, and other university-affiliated business.

In December 2010, UCLA alumni Meyer and Renee Luskin pledged a gift of $50 million to help construct ($40 million) and endow ($10 million) an academic conference center on the UCLA campus. UCLA evaluated four campus locations based upon criteria that included centrality of location, impacts to adjacent uses, site acquisition costs, and room affordability, as well as support from faculty and response from the community. The most viable site was found to be the site of Parking Structure 6 (PS 6), which is adjacent to the main entrance to the campus.

To start the planning process for the Luskin conference center, UCLA prepared a project planning guide (PPG) in 2011. The PPG stated that the Project "would consist of four components: 1) a 242,000 gsf [i.e., gross square foot] conference facility with 25,000 asf [i.e., assignable square foot] of meeting space and 250 guest rooms; 2) a 42,000 gsf parking garage for resident guests; 3) a 10,000 gsf campus catering kitchen to replace an older facility in the northwest campus; and 4) improvements to the adjacent traffic turnabout and pedestrian plaza in Gateway Plaza at the main entrance to campus." The PPG also included draft floor plans of each floor, including the subterranean level for parking. It concluded that an EIR needed to be prepared for the Project.

Because the square footage for the Project fell within the remaining development allocation of UCLA's long range development plan, for which the Regents had certified an EIR in March 2009, the EIR for the Project was tiered from the long range development plan EIR. In accordance with CEQA, UCLA prepared a "tiered initial study" to identify environmental issues or impacts from the Project that were not fully addressed in the long range development plan EIR and thus would require additional Project-level impact analysis. The initial study

4

and notice of preparation were distributed to government agencies and interested parties in November 2011, and a public information and EIR scoping meeting was held.[2]  Save Westwood submitted written comments on the initial study.

UCLA issued the draft EIR in May 2012.  The executive summary of the draft EIR provided the following Project description:  "The proposed Project involves the development of the new 8-level (7 levels above grade), 255,000-gross-square-foot (gsf) Conference and Guest Center on the site of the existing 5-level (1 subterranean level) Parking Structure 6 (approximately 2.7 acres), which would be demolished as part of the Project.  The Project would include up to 260 guest rooms; conference and meeting rooms; dining facilities with indoor and outdoor seating; lobby and lounge areas; support functions; and administrative space. . . . [¶]  A 1-level subterranean parking garage with up to 130 parking spaces would be provided that would also accommodate a loading dock. . . .  [¶]  The Project would relocate the existing UCLA catering kitchen currently at the Bradley International Center in the Northwest zone of campus to the subterranean level of the Conference and Guest Center.  The new catering kitchen would be approximately 10,000 gsf.  The Project would also include site improvements to the Westwood Plaza terminus (approximately 1.4 acres)."

The Project description was expanded upon in section 3.0 of the draft EIR.  In that section, the draft EIR provided:  "The proposed Conference and Guest

---

[2]     The notice of preparation described the Project as follows:  "The University of California, Los Angeles (UCLA) proposes the development of a 255,000-gross-square-foot (gsf) project ('the Project') on the site of the existing Parking Structure 6 (to be demolished).  The new Meyer and Renee Luskin Conference and Guest Center would include conference/meeting space and associated support facilities, guest rooms and amenities, service and support facilities, a loading dock, and one-level of subterranean parking.  The Project would also include the relocation of the existing UCLA catering kitchen (approximately 10,000 gsf) and site improvements at the Westwood Plaza terminus."

5

Center building would include conference and meeting space; dining facilities with indoor and outdoor seating; a reception area; lobby and lounge areas; support functions and administrative space on the first two aboveground levels (refer to Figures 3-4 and 3-5). Parking, the loading dock, and the catering kitchen would be located at the subterranean level to separate these uses from the operations of the conference center (refer to Figure 3-6). . . . [¶] Up to 260 guest rooms would be provided on levels 3 through 7; a conceptual floor plan for the guest room levels is provided in Figure 3-7. . . . [¶] In total, the conference and meeting rooms, guest services, service and support, and guest rooms comprise approximately 245,000 gsf of new development." The floor plans set forth in Figures 3-4 through 3-7 are virtually identical to the floor plans included in the earlier issued PPG. The draft EIR explained that the Conference and Guest Center would be open year-round, and the conference space and guest rooms would be for use by UCLA conferees and University Affiliates only, and would not be available for commercial use. It provided that "University Affiliates are non-conference guests such as visiting scholars, faculty, and staff from other institutions or UC campuses and offices; international visitors and dignitaries; parents of current and prospective students; patients or families of patients; attendees of athletic, cultural, or performance events; Alumni; Emeriti; donors; administrators; and professionals doing business with or on behalf of UCLA."

The project description section of the draft EIR also addressed the effect of demolition of PS 6 on parking availability on campus. It noted that PS 6 currently has 654 permit holder parking spaces and 100 pay station spaces. As part of the proposed Project, the 100 pay station spaces would be eliminated, and the 654 permit holder spaces would be reassigned to currently unassigned spaces within the existing parking inventory, which has 1,235 unassigned parking spaces. The draft EIR also noted that the proposed Project is projected to require approximately 397

additional parking spaces to accommodate non-overnight Conference and Guest Center guests, as well as 90 spaces for full-time employees. It determined that those additional spaces would be reassigned from the remaining unassigned parking inventory. Finally, the draft EIR noted that the parking spaces on the subterranean level of the Conference and Guest Center would be dedicated to overnight guests.

The draft EIR analyzed potential environmental impacts from the proposed Project, as well as three alternatives. Those alternatives were (1) no project/no build; (2) an alternative campus location at parking lot 36 in the southwest zone of the campus; and (3) a reduced density option, which eliminated the guest room component.[3] It concluded that the no project/no build would avoid any significant environmental impacts, but it would not attain any of the Project objectives. The alternative campus location would have impacts similar to or greater than the proposed Project, and it would not meet several of the Project objectives, including having a centrally located facility and providing a replacement catering kitchen. The reduced density alternative was the environmentally superior alternative, as it would have impacts similar to or fewer than the proposed Project, but it would not meet some important Project objectives, including (1) providing a facility that enables UCLA to host multi-day conferences and events with overnight accommodations that would minimize travel time for conferees and allow more time for informal contact between conference participants throughout the duration of their stay; and (2) providing a conference center with overnight accommodations that would enable the facility to be a self-supporting auxiliary enterprise.

---

[3] The draft EIR also explained that UCLA had considered an alternative off-campus site, but rejected it because it would not meet most of the Project objectives.

7

The draft EIR was circulated for public review and comment, and UCLA held a public hearing to receive verbal comments. A representative from Save Westwood attended the public hearing and provided comments. In addition, Save Westwood submitted a detailed comment letter, with exhibits, and Save Westwood's counsel submitted a separate comment letter.

UCLA provided detailed responses to Save Westwood's comments (as well as comments received from other sources) in the final EIR, which was issued in September 2012. The final EIR also made a few modifications to the draft EIR (including modifying the definition of "University Affiliates")[4] and described the proposed mitigation monitoring and reporting program. It also attached various documents as exhibits, including the PPG (which was approved in March 2012).

While the CEQA process was ongoing, UCLA also evaluated the proposed budget for the Project. In January 2012, it prepared a "Business Case Analysis" that summarized the Project and the development process, and provided a financial evaluation of the Project at four locations on campus. It concluded that the PS 6 site was the most viable and cost-effective location for the proposed Project. The analysis was attached as an exhibit to the final EIR.

In March 2012, the Regents' Committee on Grounds and Buildings (the Committee) held a public meeting on the amendment of the budget and approval of external financing and standby financing for the Project. An "Action Item"[5]

---

[4]    As modified, that definition provides: "University Affiliates are non-conference guests such as visiting scholars, faculty, and staff from other institutions or UC campuses and offices; international visitors and dignitaries; families of current and prospective students; patients or families of patients; Alumni; Emeriti; donors; administrators; and professionals doing business with or on behalf of UCLA. The Conference and Guest Center can be used at any time by a University Affiliate including if they are attending athletic, cultural, or performance events on campus."

[5]    The Action Item was attached as an exhibit to the final EIR.

distributed in advance of the meeting described the Project as a 294,000 gsf project consisting of (1) a 242,000 gsf conference facility with 25,000 asf of meeting space and 250 guest rooms; (2) a 42,000 gsf parking garage with 125 spaces for resident guests; (3) a 10,000 gsf operationally independent campus catering kitchen; and (4) improvements to the adjacent traffic turnabout and pedestrian areas in Gateway Plaza at the main entrance to campus. The action item explained that "[t]he Regents are being asked to: 1) approve the project budget of $162,425,000, to be funded from external financing ($112,000,000), gift funds ($40,000,000), housing reserves ($7,225,000), and campus funds ($3,200,000); 2) approve external financing ($112,000,000); and 3) approve standby financing ($35,000,000)."

Apparently, the Committee did not approve the budget or external financing at that time, and instead held another meeting in July 2012 to consider those items. The action item distributed in advance of that meeting provided the same description of the Project as the description in the March 2012 action item, except that it described the square footage of conference facilities in gross square feet rather than assignable square feet (70,000 gsf vs. 25,000 asf). The Committee approved the budget and approved the external financing at that meeting.

In September 2012, the Committee held another meeting in which it certified the final EIR, adopted CEQA findings for the Project, amended the UCLA long range development plan to transfer square footage from the Bridge and Southwest zones to the Central zone, and approved the Project design. The Project description in the action item for the meeting was the same as the description for the July 2012 meeting, i.e., a 294,000 gsf Project consisting of a 242,000 gsf conference center with 70,000 gsf of conference facilities and 250 guest rooms, a 42,000 gsf parking garage with 125 parking spaces, a 10,000 catering kitchen, and improvements to the adjacent traffic turnabout and pedestrian areas.

Save Westwood filed a petition for writ of mandate and declaratory relief in the trial court in October 2012.  Following a series of demurrers and motions to strike, the operative petition alleges a single cause of action alleging that the Regents violated CEQA by approving the Project.  Following an extended hearing, the trial court denied Save Westwood's petition and entered judgment in favor of the Regents.  Save Westwood timely filed a notice of appeal from the judgment.

## DISCUSSION

Save Westwood contends the Regents violated CEQA by:  (1) improperly pre-committing to the Project before completing the CEQA process; (2) appropriating funds for a project that was different than the Project evaluated under CEQA; (3) approving a Project that is not legally feasible because it violates the Regents' policies regarding lawful "auxiliary enterprises"; and (4) certifying an EIR that does not adequately address parking impacts from the Project.  None of these contentions is persuasive.

A.      *Pre-Commitment to the Project*

In the "Statement of the Case" section of its appellants' opening brief, Save Westwood asserts that the Luskins' $40 million pledge constituted the "equity" for the Project and was conditioned on the conference center and "hotel" being constructed on the UCLA campus.  It argues that a letter the Luskins sent to the Chair of the Regents in July 2012 "foreclosed objective CEQA review of the project by virtue of [the Luskins'] insistence that they would pull their equity contribution to the project were [the] Regents to do anything other than approve the project as the Luskins' [*sic*] envisioned it; thereby resulting in [the] Regents['] de facto pre-commitment to favorable CEQA review of the project."  In its discussion of the issue in the "Legal Argument" section of its opening brief, Save

10

Westwood argues that the trial court erred in finding that the Luskins' letter does not evidence pre-commitment to the Project. In addition, it argues that the Regents' approval of the budget for the Project without any qualification that the budget approval was contingent on CEQA approval is further evidence of the Regents' pre-commitment. We disagree.

In *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116 (*Save Tara*), the California Supreme Court addressed the circumstances under which an agency's actions should be considered a pre-commitment to approve a project before the CEQA process is completed. The Court observed that CEQA requires that an EIR be completed and certified *before* an agency approves a project that may have a significant effect on the environment. (*Id.* at p. 128, citing §§ 21100, 21151.) It noted that "[t]he CEQA Guidelines define 'approval' as 'the decision by a public agency which commits the agency to a definite course of action in regard to a project.' (Cal. Code Regs., tit. 14, § 15352, subd. (a).) The problem is to determine when an agency's favoring of and assistance to a project ripens into a 'commit[ment].' To be consistent with CEQA's purposes, the line must be drawn neither so early that the burden of environmental review impedes the exploration and formulation of potentially meritorious projects, nor so late that such review loses its power to influence key public decisions about those projects." (*Save Tara*, *supra*, 45 Cal.4th at pp. 130-131.)

The Court rejected the creation of a bright-line rule defining when an approval (or commitment) occurs, and instead referred to "the general principle that before conducting CEQA review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project.'" (*Save Tara*, *supra*, 45 Cal.4th at p. 138.) The Court cautioned, however, that "[a]pproval, within the meaning of sections 21100 and 21151, cannot be

11

equated with the agency's mere interest in, or inclination to support, a project, no matter how well defined. 'If having high esteem for a project before preparing an environmental impact report (EIR) nullifies the process, few public projects would withstand judicial scrutiny, since it is inevitable that the agency proposing a project will be favorably disposed toward it.'" (*Id*. at pp. 136-137.) The Court instructed that courts should look "to the surrounding circumstances to determine whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project." (*Id.* at p. 139.) This determination is "predominantly a legal question, which we answer independently from the agency whose decision is under review." (*Id.* at p. 131.)

With this framework in mind, we must determine whether UCLA's acceptance of the Luskins' $40 million gift, coupled with the Luskins' letter to the Regents, and the Regents' approval of the budget, are sufficient evidence to show that the Regents committed itself to the Project in a way that effectively precluded any alternatives or mitigation measures that CEQA would otherwise require to be considered. We conclude that they are not.

First, the agreement through which the Luskins pledged, and the Regents accepted, the $40 million gift contained no provisions that would preclude the Regents from considering any alternatives or mitigation measures that CEQA would otherwise require to be considered. The only commitments the Regents made were to name the conference center "the Meyer and Renee Luskin Residential Conference Center at UCLA," to provide annual reports on the status of the completion of the funding of the conference center, and to use the gift only for charitable purposes. There was no commitment by the Regents to approve any specific project at a specific location.

12

Second, the Luskins' July 2012 letter does not evidence any commitment by the Regents not to consider any alternatives or mitigation measures. While the Luskins expressed strong support for the Project at the PS 6 location, they also noted they had supported an earlier proposal to locate the conference center at the UCLA Faculty Center. To the extent Save Westwood contends the Luskins' statements in the letter that they would not have supported a proposal to build a conference center at an off-campus location foreclosed the Regents from considering alternatives, we disagree. As noted in the response to comments received by UCLA after publication of the final EIR, a release from the Luskins' pledged gift is allowed. Therefore, the Regents were not obligated to approve the Project at the Luskins' insistence; they could choose not to go forward at all, or to go forward without the Luskins' gift. In any event, the administrative record demonstrates that, in fact, the Regents did consider several alternatives, both off-campus and on-campus, as well as a "no build" alternative, as required by CEQA.

Finally, the Regents' approval of the budget before certifying the final EIR is not evidence that they improperly pre-committed to the Project in violation of CEQA. This same argument was presented to and rejected by the appellate court in *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227 (*California Oak*). In that case, the court noted that the Regents "ha[ve] enacted the 'Policy on Approval of Design, Long Range Development Plans, and the Administration of [CEQA]' (UC CEQA policy). This policy dictates that approval of a project's design, not approval of a project's budget, constitutes final 'approval' for purposes of CEQA. (UC CEQA policy, § 2.3.15 ['Design approval has been determined to be the irrevocable commitment to proceed with a project']). . . . [C]onsistent with this policy, the University prohibits the expenditure of any funds for construction of a capital project before the project's EIR is certified and its design is approved, but not expenditure of

13

funds for a project's initial planning and feasibility studies. (University of Cal., Office of the President, Facilities Manual.)" (*California Oak*, *supra*, 188 Cal.App.4th at p. 287.)

The appellate court found that, since an agency's own rules and regulations determine the exact date of a project's approval (Cal. Code Regs., tit. 14, § 15352, subd. (a)), the Regents did not approve the project at issue until it approved the project's design, which was the same day the Regents certified the EIR. Therefore, the court found that the Regents complied with section 21102, which provides that a state agency may not authorize funds for expenditure for a project that may have a significant effect on the environment unless the authorization is accompanied by an EIR. The court determined that it could affirm the Regents' approval of the project, so long as the Regents' consideration of the EIR "was reasonable and not simply a 'post hoc rationalization . . . to support action already taken.' [Citation.]" (*California Oak*, *supra*, 188 Cal.App.4th at p. 288.) The court concluded this standard was met because the Regents' approval of the project "followed a lengthy, interactive planning and review process" in which "the Regents identified and analyzed the project's significant environmental impacts; identified and analyzed alternatives and mitigation measures responsive to those impacts; actively solicited public comments; held multiple public hearings; and considered and responded to extensive public feedback." (*Id.* at p. 288.)

In this case, as in *California Oak*, the Regents approved the design of the Project on the same day it certified the EIR. The approval also followed the same kind of lengthy, interactive planning and review process that was followed in that case. There is no evidence that the Regents' approval of the budget constricted in any way its review of the impacts analysis, alternatives, or mitigation measures presented in the EIR. In short, we conclude the Regents did not violate CEQA's

14

command that an agency must complete and certify an EIR before approving a project that may have a significant effect on the environment.

B.    *Different Project Descriptions*

As noted, section 21102 provides that a state agency may not authorize funds for expenditure for a project that may have a significant effect on the environment unless the authorization is accompanied by an EIR. Save Westwood contends the Regents violated this CEQA provision by authorizing the expenditure of funds for a 294,000 gsf project accompanied by an EIR that reviewed only a 255,000 gsf project. Save Westwood is mistaken.

We acknowledge that when summarizing the Project, the EIR referred to it as a "255,00-gross-square-foot (gsf) Conference and Guest Center." But the EIR provided a more detailed description of the Project that made clear that the 255,000 gsf total did not include the subterranean parking component of the Project. In that more detailed description, the EIR stated that "[t]he proposed Conference and Guest Center building would include conference and meeting space; dining facilities with indoor and outdoor seating; a reception area; lobby and lounge areas; support functions and administrative space on the first two aboveground levels," and that "[i]n total, the conference and meeting rooms, guest services, service and support, and guest rooms comprise approximately 245,000 gsf of new development." The other components of the project – the parking and the catering kitchen – are not included in that 245,000 gsf of new development.

The square footage of those other components can be found in the PPG, which is attached as an exhibit to the final EIR. The PPG explained that, in addition to the 242,000 gsf conference facility, the Project included a 42,000 gsf parking garage and a 10,000 gsf catering kitchen – a total of 294,000 gsf, the same sized Project for which the Regents authorized the expenditure of funds. And if

15

there were any doubt that the Project described in the PPG is the same Project described in the EIR, one need only compare the floor plans included in each document; they are virtually identical. In short, Save Westwood's perceived disparity does not exist.

C.     *Auxiliary Enterprise*

Save Westwood's next contention, as best we can discern, is as follows. One of the "Project Objectives" set forth in the CEQA Findings is: "Develop a conference center for academic and scholarly exchange and provide overnight accommodations that become the economic engine that would enable the facility to be a self-supporting auxiliary enterprise." The University of California has a policy, referred to as UCOP BUS-72, that provides: "It is the policy of the University to operate, or to authorize groups affiliated with the University to operate, auxiliary enterprises which support and enhance its instructional, research and public service programs. Accordingly, auxiliary enterprises shall be conducted primarily for the convenience of University students, faculty and staff, and may only incidentally serve members of the general public." The Project as approved violates this policy because it will be a "commercial hotel" that will not "primarily" serve students, faculty, and staff, since the trial court found "that 25% of the commercial hotel will be used for non-academic purposes." Under CEQA, only legally feasible and economically feasible alternatives may be considered when evaluating alternatives. (Citing *Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336 and *Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587.) Therefore, the Regents violated CEQA by approving the Project because it is not legally feasible under the University's policy.

16

In its respondent's brief, the Regents assert that (1) this argument is barred because the trial court sustained the Regents' demurrers to Save Westwood's "auxiliary enterprise" claims, and Save Westwood has not challenged this ruling on appeal; (2) Save Westwood is misusing CEQA to challenge economic and social concerns; (3) the "Topical Responses" in the final EIR provide substantial evidence to rebut Save Westwood's argument; and (4) courts should defer to the Regents' interpretation  of its own auxiliary enterprise policy.

We conclude the Regents' first two assertions misapprehend Save Westwood's argument as we understand it.  First, Save Westwood's argument on appeal is not the same as the "auxiliary enterprise" claims that were dismissed on demurrer.  The claims that were subject to the Regents' demurrers sought to compel the Regents to perform its duties and direct that the conference center's use be limited to students, faculty, and staff of the University for academic or educational purposes.  The trial court sustained the demurrers on the ground that a court may issue a writ of mandate only to compel the performance of a ministerial duty, and the Regents' alleged duties are not ministerial.  Second, although Save Westwood's argument may indirectly attempt to address economic and/or social concerns, the argument does pose a legal question under CEQA, albeit one that relies upon questionable factual and legal assertions.

It is those questionable factual and legal assertions that doom Save Westwood's argument, as demonstrated in the Regents' third and fourth assertions.

First, contrary to Save Westwood's repeated assertion in its opening brief, the trial court did *not* find "that 25% of the commercial hotel will be used for non-academic purposes."  Rather, in addressing an argument related to a discussion of tax issues, the trial court observed that the EIR noted that "[n]o Unrelated Business Income Tax liability is anticipated because no more than 25% of projected visitors

17

are expected to be subject to UBIT, which only applies to room occupancy that is unrelated to the University's exempt education and research purposes."

Second, Save Westwood's assertion that use of the conference center by anyone other than University students, faculty, or staff constitutes use by the general public within the meaning of UCOP BUS-72 takes too narrow a view of that policy. As the Regents assert in the respondent's brief, there is substantial evidence in the administrative record that the Regents have historically interpreted UCOP BUS-72 to allow the use of auxiliary enterprises by "University Affiliates."[6] Specifically, the final EIR included a "Topical Response" that responded to comments requesting clarification of categories of guests who would be allowed to utilize the Project, and how the requirement of University affiliation relates to UCLA's mission. The Topical Response explained that existing UCLA guest houses limit guests to those with University affiliation, i.e., "individuals having a special relationship to UCLA or the University of California and its mission, including visiting scholars, faculty, and staff from other institutions or UC campuses and offices; international visitors and dignitaries; families of current and prospective students; patients or families of patients; Alumni; Emeriti; donors; administrators; and professionals doing business with or on behalf of UCLA." It noted that this same policy and practice would be extended to the proposed conference center. It also explained that UCLA will not advertise the conference center to the general public and will not accept bookings from widely available

---

[6]     As noted, the EIR stated that "[t]he conference space and guest rooms would be for use by UCLA conferees and University Affiliates only," and it defined "University Affiliates" as "non-conference guests such as visiting scholars, faculty, and staff from other institutions or UC campuses and offices; international visitors and dignitaries; families of current and prospective students; patients or families of patients; Alumni; Emeriti; donors; administrators; and professionals doing business with or on behalf of UCLA."

18

online booking sites. It stated that advertising for the conference center will clearly identify the restrictions on use of the center, and that the phone and online reservation systems will require users to identify their University affiliation, which they will be required to reconfirm at the time of check in. Thus, as the Regents assert, the proposed operation of the conference center is consistent with UCOP BUS-72, as historically interpreted by the Regents.

Finally, as the Regents assert, their interpretation of the University's internal regulatory matters is entitled to great deference. (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 889-891 (*Miklosy*).) The California Supreme Court has observed that article IX, section 9 of the California Constitution "'''grants the [R]egents broad powers to organize and govern the university.'''" (*Miklosy*, *supra*, 44 Cal.4th at p. 889.) "'The authority granted the Regents includes "full powers of organization and government, subject only to such legislative control as may be necessary to insure compliance with the terms of the endowment of the University and the security of its funds." [Citation.] Thus, "[t]he Regents have been characterized as 'a branch of the state itself' [citation] or 'a statewide administrative agency' [citation]" [citation], and "[i]t is apparent that the Regents as a constitutionally created arm of the state have virtual autonomy in self-governance" [citation].' [Citation.]" (*Id.* at pp. 899-890.) Given this constitutional grant of autonomy to the Regents, we must defer to the Regents' determination that UCOP BUS-72 allows use of the services of an auxiliary enterprise by University Affiliates as defined in the final EIR. Therefore, Save Westwood's argument that the Project was not legally feasible is not supported by the evidence.

19

D.      *Parking Analysis in EIR*

Save Westwood asserts that the EIR is inadequate because it "never fully accounts for the environmental impact of the loss of 397 (net) [parking] spaces" due to the demolition of PS 6 to accommodate the Project.  This assertion is belied by the record.[7]

As noted, the draft EIR explained that the 654 permit holder spaces that would be lost would be reassigned to currently unassigned spaces within UCLA's existing parking inventory of 1,235 unassigned spaces, and that the projected number of spaces needed to accommodate non-overnight guests or conference attendees and full-time employees of the conference center also would be assigned from the remaining parking inventory.  In addition, the final EIR included more detailed information in a "Topical Response" to questions raised about the impact of the demolition of PS 6 on the availability of parking on campus.

---

[7]      Save Westwood's argument on this issue in its appellant's opening brief consists of six sentences, plus a parenthetical reference to a "detailed argument" in a reply brief filed with the trial court.  We decline to consider any argument not set forth in the appellant's opening brief.  (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 109 ["An appellant cannot rely on incorporation of trial court papers, but must tender arguments *in the appellate briefs*"].)

## DISPOSITION

The judgment is affirmed.  The Regents shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.


We concur:



MANELLA, J.



COLLINS, J.


21